## FOOT *vs.* THE NEW HAVEN AND NORTHAMPTON COMPANY AND OTHERS.

In an action for diverting, upon the plaintiff's land, the water of a canal, located on the adjoining land of the plaintiff, where it appeared, that it was so diverted by means of a culvert, built by the defendants, on such adjoining land, it was held that the plaintiff might recover for the damages occasioned to him thereby, notwithstanding the grantor of the plaintiff consented, by parol, to the building of the culvert, and the consequent diversion of said water.

Such a license is void, under the statute of frauds, as the grant of an easement, or incorporeal hereditament, because it is not in writing, and, as a mere authority or license, was revocable by the plaintiff's grantor, during his ownership of the land, and, if it did not cease on his conveyance of it to the plaintiff, was revocable by the latter afterwards; and this, although such grantor verbally requested the defendants to build, and assisted them in building, said culvert, and agreed to save them harmless from all damages occasioned thereby, such act, of the plaintiff having no greater effect than a parol license.

If, however, the building of the culvert had been the act of such grantor, it seems that he would have no right to require the defendants to prevent it from diverting the water upon his land, and could therefore maintain no action against the defendants for not doing so.

The defendants, being a railroad company, and empowered by their charter to acquire the right, for the construction of their road, of diverting the water of said canal upon the plaintiff's land, by taking the steps prescribed by the charter for that purpose, and not having taken such steps, did not acquire such right, by such acts, and verbal arrangement between them, and the plaintiff's grantor.

Foot *v.* The New Haven and Northampton Company and others.

THIS was an action on the case, brought by Enos Foot, against the New Haven and Northampton company, Henry Ives, Charles Brockett and Arba Dickerman, for diverting the water, of what was formerly the Farmington canal, upon the land of the plaintiff.

The New Haven and Northampton company were incorporated, in May, 1836, and are the successors of the corporation estabished by the general assembly, by the name of the president, directors and company of the Farmington canal. In May, 1846, said New Haven and Northampton company were empowered to construct a railroad, on, or near the line of the Farmington canal, from a point in the city of New Haven, to the north line of this state, with power to enter upon, and use all such land and real estate, as might be necessary for that purpose, provided such land was appropriated, and compensation made therefor in the manner prescribed.

The cause was tried before the jury at the term of the superior court, holden at New Haven, in February, 1854.

On the trial, the plaintiff claimed title to the premises described in his declaration, by deed, dated January ——, 1849, from his father, Uriah Foot, who died in August, 1849.

The acts of the legislature of this state, incorporating the Farmington canal company, the New Haven and Northampton company, and the several acts relating to the charters of said companies, were offered in evidence, and made part of the case; but as they appear among the private acts of the state of Connecticut, published by authority of the general assembly, a detailed statement of their provisions is unnecessary.

It was proved and admitted, that the diversion of the waters of what formerly constituted part of the Farmington canal, complained of in the plaintiff's declaration, and the injury proved, whatever it was, were effected by a brick culvert, erected in February, 1848, running under the railroad of the New Haven and Northampton company, and the

turnpike of the Cheshire turnpike company, no part of which was constructed on the plaintiff's land.

The defendants offered evidence to prove, and claimed, that they had proved, that said culvert was a permanent and expensive structure, about seventy feet in length, and of about six feet span, erected and built by the New Haven and Northampton company, in the construction of their railroad, under their charter; that the same was erected and built by them, opposite to the plaintiff's premises, where it now remains, at the express solicitation and request of said Uriah Foot, the then owner of said premises, who desired to have the same there placed, for the irrigation of his adjacent land; that said Uriah Foot coöperated and assisted in the erection of said culvert, and agreed with said company, for himself and his heirs, forever, to take care of the waters so diverted, and to guarantee said company against damage therefrom; and that said company would have diverted said water at a point above the plaintiff's said land, where, as they claimed, they had acquired a right to discharge said waters, but for the request and agreements aforesaid of the said Uriah.

The defendants claimed, that, if the facts were as claimed by them, they were not, any of them, liable to the plaintiff in damages for the necessary, natural and foreseen effects, resulting from the erection of said culvert, and requested the court to charge the jury, in conformity to said claim.

The plaintiff claimed that, as the requests and agreements of the said Uriah Foot, claimed by the defendants, rested solely on parol evidence, they constituted a mere parol license which was revoked by his death, and also by express notice to that effect, by the plaintiff, personally, to each of the defendants, since his father's decease; which notice was admitted: and that he was entitled to recover, from each of the defendants, whatever damages had accrued to him, by

means of said diversion, since the revocation aforesaid. The plaintiff requested the court, to charge the jury in accordance with his claims.

The court did not charge the jury as requested by the plaintiff, but did, *pro forma*, charge them in conformity to the claims of the defendants.

The jury having returned a verdict for all the defendants, the plaintiff filed a motion for a new trial.

*R. I.* and *C. R. Ingersoll*, in support of the motion, contended,

1. That the right, set up against the plaintiff, under parol authority from his grantor, is a perpetual, assignable, indefeasible right to use the land of the plaintiff, without compensation, for the discharge and passage of a large body of water, at the convenience of the party controlling its flow; a claim in direct conflict with the statute of frauds, which requires all " contracts for the sale of lands, tenements, or hereditaments, or any interest in or concerning them, to be in writing." In its strictest sense, it is a claim for an easement upon the plaintiff's land, which is not only a " hereditament" within the statute, but, at common law, could only be created by " deed, devise, or record." Angell on Water Courses, § 168, *et seq.*

2. That the parol authority, claimed to have been given to the New Haven and Northampton company, by the plaintiff's grantor, cannot avail the defendants in the present action, as a license.

The general principle, that a license is a personal privilege, not assignable, countermandable at the will, and determinable by the death of the licenser, is undeniable. (1.) The fact, that the culvert through which the diversion is made, is " a permanent and expensive structure," and was built at the request of the licenser, does not except the case from this general principle.

The authorities, both in Great Britain, and in this country,

are now uniform to the effect that a right, "concerning lands," like that claimed by the defendants, cannot be created by any parol authority, or in any way except by deed.

This doctrine was finally established in England, by the case of *Wood* v. *Leadbitter*, 13 M. & W., 838. See also *Hewlins* v. *Shippam*, 5 B. & C., 221, (11 E. C. L., 207.) *Taplin* v. *Florence*, 70 E. C. L., 760. 1 Sugden on Vendors, 91. *Prince* v. *Case*, 10 Conn. R., 381. *Bridges* v. *Purcell*, 1 Dev. & Bat., 493. *Miller* v. *Auburn & Syracuse R. R. Co.*, 6 Hill, 62. *Brown* v. *Woodworth*, 5 Barb., 550. *Houghtaling* v. *Houghtaling*, 5 Barb., 379. *Mumford* v. *Whitney*, 15 Wend., 380. *Stevens* v. *Stevens*, 11 Metc., 251. (2.) Whatever question there may have been, as to the effect of an executed license between the original parties, such a license as that here claimed has, in no case, been held to extend to their heirs, or assigns. Were it otherwise, our land records would be of little value. *Bridges* v. *Purcell*, 1 Dev. & Bat., 493. *Seidensparger* v. *Spear*, 17 Maine, (5 Shepley,) 123. *Perry* v. *Fitzhowe*, 8 A. & E., (55 E. C. L.,) 756. *Prince* v. *Case*, 10 Conn. R., 381.

3. That although the act, which enables the defendants to build a railroad, along the margin of their canal, is sufficient authority for their building a culvert, as a part of their road, yet no authority is given to them, to divert, or discharge a body of water upon the land of another, and, by constant replenishing, to continue the water there forever. Any parol agreement, purporting to confer such a right, or interest, could operate only as a license revocable, if it could have any operation at all.

*Baldwin* and *Beach*, contra, contended,

1. That, where the acts done on the faith of a license, are capable of being, and are in fact, perfected upon the land of the defendant, the plaintiff cannot by revoking such license, recover for the consequent damage to his own land, caused by the "natural, necessary, and foreseen effects," of such

acts. *Winter* v. *Brockwell,* 8 East, 308. *Liggins* v. *Inge,* 7 Bing., 682. *Woodbury* v. *Parshley,* 7 New Hamp., 237. *Addison* v. *Hackie,* 2 Gill., 221. *Dyer* v. *Sandford,* 9 Metc., 395. *Johnson* v. *Lewis,* 13 Conn. R., 304.

2. That a license is always a perfect protection against any act done under it, before revocation.

All the authorities sustain the position, that " licenses to do a particular act, do not, in any degree, trench upon the policy of the law, which requires that bargains, respecting the title, or interest, in real estate, shall be by deed, or in writing. They are only an excuse, for an act which would otherwise be a trespass." *Cook* v. *Stearns,* 11 Mass., 533. *Prince* v. *Case,* 10 Conn. R., 379.

Here " the damage, whatever it was," was caused by the erection of a culvert.

The plaintiff's grantor, not only authorized, but coöperated and assisted in its erection; since then, the defendants have done nothing, and they exercise no control over the water, which flows through it.

3. That it is difficult to state any facts, more urgently calling for the application of the principle of equitable estoppel, than those found by the jury, and the plaintiff cannot now make the defendants pay him, for " the necessary, natural, and foreseen effects," of this act of his own grantor. 2 Am. Lead. Ca., 687.

4. That the doctrine of parol licenses, and their effects, does not arise, in the present case. (1.) The effect of a license, is to render some act lawful, which would otherwise be unlawful. No individual would have a right to divert this water, upon the plaintiff's land. He can only acquire it by agreement of the owner, and if such agreement is not in writing, it raises the questions we have been considering. (2.) But the state, by virtue of its right of eminent domain, has the right to divert this water upon the plaintiff's land, or to appropriate it altogether, subject, of course, to his right of just compensation. 2 Kent. Com., 339. (3.)

This culvert was built by the New Haven and North-ampton company, under the authority of the state, in the construction of their railroad.

Their charter gave them the right to put the culvert where they did, without any license, verbal or written, from the owner of the adjacent land. Private Acts, 1846, p. 84. *Bradley* v. *N. Y. & N. H. R. R. Co.*, 21 Conn. R., 294. *Clark* v. *Saybrook*, 21 Conn. R., 313. *Nicholson* v. *N. Y. & N. H. R. R. Co.*, 22 Conn. R., 74.

The only question, therefore, between the defendants, and the owner of the land, was one of damage, and that was satisfactorily disposed of by the parties. It could as well be done by parol agreement, as by a written one, under hand and seal. *Clement* v. *Durgin*, 5 Greenleaf, 1. *People* v. *Goodwin*, 1 Selden, 568.

STORRS, J. We are not distinctly apprised, nor is it material to ascertain, in what capacity, or in what relation to the New Haven and Northampton company, the other defendants acted, when they assisted in building the culvert, of the effects of which the plaintiff complains. At that time, the land, which adjoins the site of the culvert, and is said to be injuriously affected by it, was owned by Uriah Foot, and the acts of these defendants were done by his license or direction. No authorities are needed to support the opinion, that such a license, or direction, furnished a legal excuse for their conduct. And as it does not appear to have been proved, or even claimed on the trial, that either of them had any interest in the culvert itself, or in the land on which it was constructed, or any control over the culvert, or the land, or any interest, (after the completion of the work,) in the affairs of the New Haven and Northampton company, or that, since that time, they had done anything which would render them liable to the plaintiff's grantor, before the title of the plaintiff accrued, or afterwards, to the plaintiff himself, it follows that no cause of action was shown against

these defendants, and that the verdict, so far as it relates to them, should not be disturbed.

But, upon the facts presented, the New Haven and Northampton company must be deemed to have continued the culvert, at the place under their railroad, where it was at first constructed; and thereupon, certain questions of law arise, in relation to which, the charge to the jury is considered erroneous by a majority of this court, and a new trial is advised.

As the culvert, which caused a diversion of the water of the canal upon the land of the plaintiff, was built, while the land was owned by Uriah Foot, (who, before his death, conveyed it to the plaintiff,) the plaintiff cannot recover for that injury, or for the injury, arising from the continuance of the culvert, prior to the conveyance to himself. Such acts were an injury to his grantor and not to him. He has therefore limited his claim for redress to such damage, as was caused by the continuance of the culvert, after his own title accrued; insisting that he is, at least, entitled to recover for the continuance of the injury, after the revocation of the license, under which the structure had been built; whether the death of his grantor, who gave the license, amounted of itself to such revocation, or whether the license remained in force until the express revocation of it, by the plaintiff himself. Accordingly, we have no direct concern with the defendants' right, as against the grantor of the plaintiff, to build the culvert, but are simply to determine whether it was rightfully continued by the defendants, as against the plaintiff, after he became the owner of the land, or after the legal, or actual revocation of the defendants' license: so that the circumstances, under which the culvert was built, have no importance here, except in so much as they affect the right of the defendants, to continue it. And, even if these circumstances show that the license, granted by the former owner, was revocable by him, it would not follow that, because it was not revoked by him during his ownership, and conse-

quently justified all the acts of the defendants as against him, it would also justify the continuance, or repetition of those acts, against a subsequent purchaser, after a conveyance to such purchaser, or after the death of the original grantor of the license, or after the express revocation of the license by the purchaser. On the contrary, either of these incidents might suffice to terminate the defendants' privilege. We go further. Even if it should appear that the license granted was irrevocable by the grantor of the plaintiff, it would not follow, that the plaintiff could not revoke it.

The plaintiff, having an absolute and unrestricted conveyance of his land from the former owner, has presumptively a full and unqualified dominion over it, subject to no servitude, or easement, in favor of any other person. The act, therefore, committed by the defendants, in turning the water of the canal upon it, was an invasion of the plaintiff's rights, unless it was justified by the facts put in evidence by the defendants, upon whom the burden of establishing such justification rests. The facts found by the jury, and on which the defendants rely, are these. The company built the culvert on land adjoining the land of the plaintiff, at the verbal request of Uriah Foot, who then owned the adjoining land, and by whom it was subsequently sold, and conveyed to the plaintiff. The said Uriah desired that the said culvert should be so located, for the irrigation of his own land, and actually coöperated and assisted in building it; verbally agreeing with the defendants for himself and his heirs forever, to dispose of the water which should be diverted upon his land, and to guaranty the defendants against any damage therefrom. The company would have diverted the water at a point above the land of said Uriah, and where they had a right to discharge it, but for the said request and agreements of the plaintiff's grantor. On the other hand, it was found, for the plaintiff, that, after he became the owner of the land, and also after the death of Uriah Foot, he revoked the license conferred by his grantor, giving an express notice to that effect, to all the defendants.

These facts furnished ample proof of a license from Uriah Foot, to the defendants, to construct the culvert, and to overflow his land ; and as this license was never revoked by him during his ownership, it constituted a justification for the diversion of the water for that period. We are as clearly of opinion, however, that the effect of the license, or agreement referred to, inasmuch as it was by parol, was not to convey to the defendants any estate, or interest in the land, which it was contemplated to overflow. The right perpetually to divert water upon that land, as claimed by the defendants, would be an incorporeal hereditament, and therefore an estate or interest in it; and such a right, the license, proved by the defendants, would be ineffectual to convey. To hold the contrary would be a direct abrogation of the statute of frauds, which requires all contracts for "the sale of lands, tenements, or hereditaments, or of any interest in or concerning them," to be in writing. The privilege, therefore, conferred on the defendants by the parol request, and agreement of Uriah Foot, is reduced to a mere license, although, in its terms, it was a more extended grant. The authorities on this point are uniform.

It is equally well settled, that a mere license, which is only an authority or power to do particular acts, uncoupled with an interest in the subject of those acts, (serving simply to justify such acts, while leaving the estate, and all the incidents of ownership, in the proprietor of the land,) is, in its nature, revocable. If it were not revocable, it would transfer to the licensee an interest in the land ; it would have the effect of a grant.

We consider it also to be now an established principle of the common law, although some ancient cases may seem to conflict with it, that when the right to do acts upon the land of another is of such a nature, as to require to be created by a grant, in order to be primarily indefeasible, a mere license to do such acts does not become irrevocable, because it has been executed by the licensee ; although such execu-

tion may have been attended with expenditure of money or labor, and although, also, the termination of said license may cause the loss of such expenditure.

Nor do we think that the revocability of the license depends at all upon the circumstance that the acts authorized by the plaintiff's grantor, were to be done, if considered only in respect to their immediate or direct effect, upon land not owned by him; so long as the necessary and inevitable consequence of those acts would be an exercise, on the part of the defendants, of a right in the land of the grantor himself, and to restrict the dominion of the latter over it: a right, which if made indefeasible by a grant, would burden the land with a perpetual easement. In fact, the privilege conferred on the defendants was, in form, a license to build the culvert on the defendants' own land, but in substance a right to overflow the land of the licenser himself. To construct a culvert on land adjoining his own, and really already under the defendants' control, by virtue of their charter, was an act, which, independently of its tendency to cause an overflow upon the land of the grantor, the defendants had an unquestionable right to do, without his sanction, and which, in this view of the matter, was not done by virtue of his authority. What required his license was, that the company might, by means of the culvert, turn water upon his land; and this diversion was the subject of the license, rather than the mere construction of the culvert. The permission to build the culvert, which would necessarily cause the diversion of the water, was really a permission so to divert the water, and to affect the rights of the licenser in his own land. We cannot see why such a license should not be revocable in the same manner, as if the acts authorized to be done, were done on the premises of the licenser, consequently producing the same effect there.

Reference has been made by the defendants to a few very peculiar cases, the most prominent of which is *Liggins* v. *Inge*, 7 Bing., 682, as sustaining some such distinction, as

has just been alluded to. The doctrine of these decisions is, that if one, who has a privilege on the land of another, permits that other to do acts, which are inconsistent with the enjoyment of the privilege, or tend to its destruction, such indulgence or license, if acted upon, or executed by the owner of the land, operates as an extinguishment, or abandonment of the privilege. If these cases were correctly decided, (about which we express no opinion,) they have no application to the case now before us. It will be seen, on examination, that the courts, so far from passing upon the question, whether an easement or interest in land can be acquired by parol license or agreement, executed or not executed, distinguish those cases from such as involve that issue. Besides, in the present case, Uriah Foot neither had, nor claimed, any privilege in the land on which the culvert was built, nor did he, by the terms of his license, deprive himself, or pretend to deprive himself, of any such privilege. On the contrary, the claim of the defendants is, that an easement was conferred upon them, in the adjoining land of Uriah Foot, consisting in a perpetual right to divert water upon it.

We have not deemed it necessary to accompany our statement of principles, with a particular citation of the authorities by which they are supported. The cases on the subject, with the exception of the important case of *Bridges* v. *Purcell et al.*, (1 Dev. & Bat., 493,) are collected in the second volume, page 506, of Select Decisions of American Courts, by Hare and Wallace. We are aware, that several decisions have been made in the courts of some of the United States, (adverted to in the work just named,) in which greater effect is given to the circumstance, that a parol license to perform acts upon land has been executed by the licensee, especially, where such execution has involved the expenditure of money or labor, than the principles we have adopted would warrant. It is true, that some of those decisions go to the extent of holding that the license, after

such execution, is irrevocable, and that thereby the licensee
acquires an indefeasible and perpetual right to maintain,
without disturbance, the condition in which he is placed by
such execution. Those decisions were made, in states,
where, as in Maine, Massachusetts, and New Hampshire,
there are no courts of equity, with ordinary chancery jurisdic-
tion, and where, therefore, it may have been deemed necessary,
in order to administer substantial justice, that the strict prin-
ciples of the common law should be modified by the distinct-
ive principles of equity jurisprudence; or where, as in
Pennsylvania, courts " possess the power of administering
the principles of equity through the medium of legal forms."
With us, however, the administration of the two systems is
kept distinct: so that, in considering the questions before
us, we have been governed less by decisions in the states, to
which allusion has just been made, than by cases adjudicated
in other states of the union, and in England, where courts
administer purely the principles of common law, modified
only in certain instances, having no relation to the subject
now under discussion, by the incorporation of equitable
principles, into the legal system. In *Bridges* v. *Purcell et
al.*, (1 Dev. & Bat., 492,) it was held, that one, whose land
is overflowed by a mill-pond, has a right to recover for the
damages suffered thereby, notwithstanding that his ancestor,
by parol, expressly permitted the grantor of the defendant to
erect the dam, and consequently, to overflow the land; that
such permission, if set up as a grant of a perpetual right to
overflow the land, (which would be an incorporeal heredita-
ment,) was void for want of a deed; and that, if regarded
as a mere license or authority, it was revocable and ceased
with the life of the licenser. The eminent judge, who
delivered the opinion of the court, reviewed with his usual
ability and clearness, the prominent authorities, which might
be supposed to favor the defendant, and discussed the
general principles applicable to the case; showing most
satisfactorily, as we think, that none of them sustained the

doctrine that such a license, although acted upon by the licensee, passed any interest, or estate, in the land of the plaintiff, or was irrevocable. Unless there is distinction in principle between a license to turn back water upon another's land, by means of a dam below it, and a permission to overflow it by means of the diversion of a stream from above, (which would hardly be claimed,) the case just cited is strictly analogous to the present.

It results from the principles which we have thus adopted, that it was the right of the plaintiff's grantor, at any time during his ownership of the land, now belonging to the plaintiff, and even after the erection of the culvert, to revoke the license under which the defendants were permitted to divert the water. It follows, as a matter of necessity, that the plaintiff, after his purchase, had an equal right to annul the license.

Much stress has been laid on the fact that Uriah Foot, in connexion with his request that the culvert should be built, and his agreement concerning it, actually coöperated and assisted in its construction. Now, whether that agreement would be enforced in a court of equity, on the ground of its execution, we are not here called upon to determine; but at law, it cannot, existing only in parol, have any greater force, or stand on higher ground than a mere license, notwithstanding its execution. If these acts of Uriah Foot were to be regarded as done independently of the defendants, and the erection of the culvert as his act, and not that of the defendants, the latter might indeed successfully urge that although the plaintiff might not be bound to allow the culvert to remain, the defendants would be exonerated from any obligation to remove it, and could not be treated as a trespasser on account of its continuance. But the facts proved will not allow us to regard the building of the culvert as the act of Uriah Foot. On the contrary, the finding shows that "it was erected, and built by the defendants in the construction of a railroad, under the charter" of the

principal defendants, to whom of course, Uriah Foot's services were rendered; and that although the culvert was made at his request, his assistance was furnished in behalf of such principal defendants and not in his own. Indeed, if it was built "under the charter," it must have been built by those defendants, who were authorized to construct it for the accommodation of a railroad; otherwise we must adopt the idea that Uriah Foot constructed it, without law or right; a supposition unwarranted by the proof, and inconsistent with the defendants' claim.

But, whatever might be the rights of parties if the land in question still remained the property of Uriah .Foot, the issue now presented is between the defendants, and a *bona fide* purchaser of the land for a valuable consideration, without any notice, actual or constructive, of any previous agreements between the former owner and the railroad company. That such a purchaser is not affected, by such an agreement, was settled by the decision of *Prince* v. *Case*, (10 Conn. R., 375.) To hold that such an agreement runs with the land, and creates an easement upon it even in the hands of a *bona fide* purchaser, amounting to a permanent encumbrance, would be not only to invade the statute of frauds, but a violation of the most salutary policy of our recording system, and also in such cases, as that now under review, of obvious principles of justice. On this point, we give our renewed sanction to the views of this court, as expressed by Chief Justice Williams, with his accustomed force and clearness, in the case just quoted; views which are strongly confirmed by the case of *Bridges* v. *Purcell et al.* In the latter, the ancestor of the plaintiff had given a license to the vendor of the defendant. The opinion of Judge Gaston, after showing that the pretended grant, for want of a deed, passed no interest in the land, and imposed no charge upon it, and could not prevent the plaintiff from succeeding to an unlimited and unshackled fee-simple therein, thus proceeds in respect to the privilege claimed : "Regarded as a license,

how does it enure to the benefit of the defendants? If it passed as an appurtenance to the land, it partook of its nature; it was more than an authority, it was a hereditament. To hold that a permission, thus given, shall operate forever for the benefit of the grantee, and his assigns, against the grantor and his heirs, would be, in effect to permit a fee-simple to pass under the name of an irrevocable license. Purchasers would never know what encumbrances were upon their lands, and instead of the solemn and deliberate instruments, which the law requires, as the indispensable means of transferring freeholds, valuable landed interests would be made to depend wholly on the integrity, capacity and recollection of witnesses."

The defendants claim, lastly, that as the act of diverting the water upon the plaintiff's land was within the scope of the company's chartered powers, communicating the exercise of the right of eminent domain, nothing remained but to compensate the owner for the damages caused to him thereby, and that this had been done by an adjustment between the defendants and the owner. If the land had been lawfully condemned for the purposes of the company, no objection could be made to the validity of such an adjustment. But the powers of the defendants were acquired under a special grant, to be exercised only on special terms; and it was necessary for the company, in order that there should be such a condemnation, to pursue the steps prescribed by their charter for that purpose. Those steps were not taken, and the land was not therefore subject to the powers claimed by the defendants. This ground of justification therefore fails.

The superior court is therefore advised 'that a new trial should be granted.

In this opinion CHURCH, C. J., and HINMAN, J., concurred.

WAITE, J. In my opinion, the instruction given by the court to the jury, in this case, upon the evidence, as detailed in the motion, is founded upon the plainest principles of justice, and is sustained by the best authorities.

What was that evidence? The railroad company, in constructing their road, under their charter, found it necessary to make a culvert to carry off the water, which formerly constituted a part of the Farmington canal. They could turn it above the plaintiff's land, then owned by the plaintiff's father, Uriah Foot. But he requested them to place the culvert adjacent to his land, that it might thereby be irrigated, and he agreed, that if they would do so, he would forever take care of the water, and guarantee the company against any damage that might result therefrom.

In compliance with his request, and with his coöperation and assistance, the defendants erected a permanent and expensive brick culvert under their road, no part of which was placed upon the plaintiff's land, and no claim is made that they ever have done any act, in any manner affecting the plaintiff's rights, other than suffering the culvert to remain where it was originally built.

After the structure was completed, Foot conveyed his land to the plaintiff, who now brings his action complaining of the culvert, as a nuisance, and seeks to compel the defendants to remove it.

Upon this evidence, the court told the jury, that if they found the facts to be as claimed by the defendants, they were not liable, for the necessary, natural, and foreseen effects, resulting from the erection of the culvert. The court was careful to place its exoneration, entirely, upon the natural consequences of the original act.

The plaintiff, by virtue of his deed, acquired no greater interest in the land than Foot, his father, had, at the time of the conveyance. The question is then brought to this: could Foot, were he now living, and still the owner of the land, treat the culvert, built where it is, at his request, and

with his assistance, as a nuisance, and by a succession of actions, compel the defendants to tear it down and remove it? If he could, it would seem to be one of those few cases where justice may be perverted, under the sanction of law.

The license which he gave was undoubtedly revocable, before the acts which it authorized were done—and had it authorized several successive acts, it would have afforded no justification for those done subsequent to a revocation. But the defendants can never be made trespassers for doing those acts under it, which the license permitted, and before any revocation.

It has been said that such parol license is, in its nature countermandable, at any time, at the pleasure of the party who gave it, and that to hold otherwise would be to allow such a license the effect of having an interest in real estate, contrary to the statute of frauds.

But it is to be borne in mind that the culvert was placed entirely upon the defendants' land, or where, independent of any license, they had a right to place it, and the only injury complained of, is the natural consequence resulting from the original act. And if that was authorized, it is difficult to see why those consequences were not also authorized.

Foot conveyed no interest in his land to the defendants, and they claim none in any land the plaintiff now owns. They neither raise nor shut any water-gates, and pond no land of his, to operate any mill of theirs.

Suppose he had been the owner of a dwelling-house, in which were ancient lights, standing close to the defendants' land, upon which they were about to erect an expensive building, and he had requested them to place their building close to his, for the protection of his walls, and expressly waiving all objections, on account of any injury to his lights; could he, after they had erected their building, as he had requested, call upon them to pull it down, because it injured his ancient lights, and say to them, my license amounts to nothing, as it was merely by parol?

It seems to me that such a case could not stand for a moment in a court of justice; and yet I can discover no essential difference, in principle, between the case supposed, and the one under consideration.

But I have said, that the ruling of the court below, was not only in accordance with justice, but has the support of authority, and the case of *Liggins* v. *Inge*, seems directly in point.   7 Bing., 632, (20 E. C. L., 237.)

There the plaintiff's father being the owner of an ancient mill, by parol license, permitted the defendant to lower the bank of the river, upon his land above the mill, and place a weir upon it, by means of which the flow of the water to the mill was diminished.   The plaintiff, deriving title from his father, brought an action on the case against the defendant, for diverting the water of the river from his mill, and the court, upon due consideration, held that he was not liable.

Tindal, C. J., in delivering the opinion of the court said: " This is not a license, to do acts which consist in repetition, as to walk in a park, to use a carriage-way, to fish in the waters of another, or the like, which license, if countermanded, the party is put in the same situation, as he was before it was granted; but this is a license to construct a work, which is attended with expense to the party using the license ; so that after the same is countermanded, the party to whom it was granted may sustain a heavy loss.   It is a license to do something, that in its own nature, seems intended to be permanent and continuing.   And it was the fault of the party himself, if he meant to reserve the power of revoking such a license, after it was carried into effect, that he did not expressly reserve the right, when he granted the license, or limit it as to duration.   Indeed, the person who authorizes the weir to be erected, becomes in some sense, a party to the actual erection of it, and cannot afterwards complain of the result of an act, which he himself contributed to effect."   The reasoning of Chief Justice Tindal, in my opinion, applies with great force to the present

case. Both upon principle and authority, therefore, I think the license in the present case, after it was executed, was not countermandable by the person who gave it, and consequently, that the present action cannot be maintained. See also *Winter* v. *Brockwell*, 8 East., 308, and other cases cited in the two cases here mentioned.

For these reasons, I am of opinion that no new trial ought to be granted.

New trial to be granted.