# COURT OF APPEALS.

HENRY H. BABCOCK and others, respondents agt. FRANCIS A. UTTER, impleaded with others, appellant.

A mere *license* is in its very nature revocable.

If a *parol license* be coupled with a grant, so as to be essential to the enjoyment of the thing granted, then the license may become irrevocable.

But if a parol license be coupled with a *grant by parol* of that which can only be effectually granted by deed, then the license remains a mere license, and, therefore, capable of being revoked.

A *riparian owner*, by license of owners above, on the same stream, enters upon their lands, and constructs there a dam and a canal to flow on his lands and work his mill : *Held*, that the license was revocable.

The contrary doctrine considered to be equally in conflict with the common law rule that an easement can only be created by deed ; with the statute of frauds, prohibiting the conveyance of any interest in lands other than short leases, without writing ; and with the statute requiring deeds for the conveyance of freehold interests.

Nor is the licensor's right of revocation impaired by the fact that the licensee, relying upon the license, had erected expensive works upon his own land, the value of which depended on the use of the canal and dam.

The principle that the owner of lands who encourages another to expend money upon them under an erroneous opinion of title, is *estopped* from afterward asserting his legal rights, is inapplicable to this case. Where there is no fraud on the part of the owner of the land, and the person making the expenditure knows the state of the title, he makes it at his peril, and acquires no equitable rights against the owner thereby. *Mumford* agt. *Whitney* (15 *Wend.* 380) reaffirmed. *Renick* agt. *Kem* (14 *S. & R.* 267), disapproved.

Where one, in pursuance of a license, enters upon another's land, and constructs a dam and canal, and keeps the same in repair, there is no adverse possession ; there can be, therefore, no presumption of a grant arising from lapse of time.

A license is a merely personal right, and is not susceptible of conveyance.

A mortgage, therefore, of a mill, the water power of which depends partly upon parol license and partly upon grant, will not give the mortgagee title to the former part.

But where the mortgage conveys the premises upon which the mill stands, describing them by metes and bounds, but contains no reference to the mill, nor the word "appurtenances," or any equivalent expression, it conveys, nevertheless, such right to the water power as the mortgagor possesses, not depending upon mere license, although such right may extend beyond the premises actually described in the mortgage. The instrument must be interpreted as though executed and delivered in view of the premises, and, therefore, to convey the mill, as such, with whatever gave it its value as a mill, and which the grantor had power to convey.

Where the owner of land upon a mill stream, *ad medium filum aquæ*, conveys the land by metes and bounds, " beginning at a stake on the bank of the river," running thence by courses and distances around the farm, until it comes again "to

the U. river," and runs " thence down the bank of the river as it winds and turns, to the place of beginning," the title to the river and the land covered by it, remains in the grantor.

*March Term,* 1864.

THIS action was commenced by the plaintiffs in the supreme court in equity, in September, 1847, to have their right to a stream of water declared and established ; to obtain a perpetual injunction against the diversion of the stream from their factory, and to recover damages for previous diversions.

The facts appearing from the pleadings and the report of the referee, before whom the cause was tried, so far as they have any material bearing upon the questions presented on the appeal, are substantially as follows :

On and prior to April 1, 1820, William Utter, one of the defendants, was the owner of eleven acres of land in the town of Plainfield, Otsego county, and also of another lot of four acres, north of and adjoining the eleven acres ; both pieces being bounded on the west by the west branch of Unadilla river.  In the year 1821, said Utter, in contemplation of erecting carding and cloth-dressing works on the eleven acres, constructed a dam across said west branch, on lands some distance north of his own, which were owned by Henry Clarke, on the west side, and by Isaiah Hilliard, on the east side of said branch.

During the same year he constructed a canal from said dam, southerly across the lands of said Hilliard, of Thier Johnson, and the two pieces of four and eleven acres before mentioned, to the southerly side of the eleven acres, for the purpose of propelling machinery thereafter to be placed on said premises, with water to be drawn from the dam, through said canal.

In 1821 or 1822, he erected on the eleven acres, a saw mill, and carding and cloth-dressing works, and placed therein machinery proper to be used in such works, and put the same in operation, the propelling power being the water drawn from the dam through said canal.

In 1824, he obtained from Isaiah Hilliard, a lease for the term of ten thousand years, of three-quarters of an acre of

land, on which the east end of the dam stood, together with the right of flowing so much of the land of said Hilliard, as would be flowed by a dam five feet six inches high, measuring from the bed of the stream, at an annual rent of seven dollars. The canal was made over the lands embraced in this lease.

Henry Clarke verbally consented to the abutting of the west end of the dam on his land, and the canal was constructed across the land of Thier Johnson, with his assent; and the license so given by Clarke and Johnson, the referee finds has never been revoked.

William Utter, and those claiming under him, used said saw mill and clothing works, and carried on the business of sawing lumber and dressing cloth therein, by means of water drawn through said canal, and from no other source, until August, 1831, and there was no other source from which water for that purpose could be obtained.

In August, 1831, said Utter executed and delivered to William Johnson, a mortgage upon the eleven acres upon which the mills and machinery stood, describing them by metes and bounds, but without the word "appurtenances," or other equivalent words, and without any reference to the mills or machinery, or any improvements upon the land. The mortgage was duly acknowledged and recorded, and became a valid lien upon the premises. At the time when the mortgage was given, the mills and machinery were in use, and the water for propelling such machinery was drawn from said canal.

On the 15th of December, 1834, there was due to Johnson upon the mortgage, $2,611.55, and he thereupon proceeded to foreclose the mortgage by advertisement, pursuant to the statute; and on the 2d of June, 1835, the premises were sold at auction, in accordance with the advertisement, and purchased by the mortgagee. Johnson, by his tenants, occupied the said premises, mills and machinery, from the time of his purchase until April 10, 1846, when he entered into a contract with the plaintiff Babcock, for the sale of the prem-

ises to him, for the consideration of $1,100, and gave him immediate possession.

In the following August, the purchase price having been paid, Johnson, by quit-claim deed conveyed the premises to Babcock, who in November thereafter, conveyed five-sixths thereof to his five co-plaintiffs in this action, the purchase having been made originally for the use of all those parties.

The plaintiffs removed the buildings used by Utter for a saw mill and clothing works, and erected in their stead a valuable building for a hoe factory, and used the same for the manufacture of hoes, propelling the machinery with water taken from the dam erected by Utter, and through the canal constructed by him.

William Utter and others, who occupied the eleven acres, and used the mills and machinery thereon, found it necessary on several occasions to repair the dam, and for that purpose to use gravel from a pit on the farm of Henry Clarke, or those claiming under him ; and before making such repairs, on some of those occasions, leave to go upon the farm to get gravel for that purpose, was asked of the owners or occupants, and granted. On some two or three or more occasions, while William Utter was in possession, permission was asked from Henry Clarke to go upon his land to repair the dam. The right of Utter, and those claiming under him to maintain the dam and canal, or ditch, and draw water through the ditch, was never called in question by any of the owners of the lands on which the dam abutted, and over which said canal or ditch was dug, until after the contract was entered into between Johnson and Babcock, in April, 1846, for the purchase by the latter of the eleven acres.

Henry Clarke, who was the relative and intimate friend of William Utter, died in 1831, seized of the farm on which the west end of the dam in question stood, leaving a will duly executed, by which he devised the farm to his three sons. On the 27th of May, in the same year, and after the death of their father, the three sons conveyed the farm to Ethan Clarke, one of the defendants in this action, but bounding him by the westerly bank of said river, instead of by the

centre, to which the farm extended, as described in the patent
from the state to said Henry Clarke. The material part of
the descriptive portion of the deed to Ethan Clarke is as fol-
lows, viz : "Beginning at a stake and stones on the west
bank of Unadilla river, at the north corner of widow Clarke's
farm ; thence south five chains and thirteen links, to a stake
and stones ; thence," &c., giving a great number of courses
and distances, the two last of which are as follows : " thence
north eighty-five degrees east, twenty-four chains and thirty-
four links, to the Unadilla river ; thence down the west bank
of the Unadilla river, as it winds and turns, to the place of
beginning, containing," &c.

In March, 1839, William Utter, in consideration of $50,
assigned to the defendant, Francis A. Utter and Jacob S.
Utter, the above mentioned lease from Hilliard, and in
August, 1846, Jacob S. Utter assigned his interest to said
Francis A.

On the 4th of May, 1846, Ethan Clarke, the grantee above
mentioned, granted to said Francis A. Utter, by an instru-
ment in writing under his hand and seal, in consideration of the
sum of $15, to be thereafter annually paid by said Utter, the
exclusive privilege of maintaining so much of the aforesaid
mill dam as was located on said Clarke's premises ; also the
privilege of controlling the water by dams and dykes, to the
centre of said west branch, for fifteen rods above the dam ;
also the privilege of controlling said water down said west
branch along its banks, to the centre of the stream, to the
south-east corner of said Clarke's land ; also the privilege
of taking earth or gravel from the bank, as had been there-
tofore accustomed, for repairing the dam, with the privilege
of access to the gravel bank.

Before this lease was obtained, Francis A. Utter had been
informed that Babcock had a contract for the purchase of
the mill property ; and some time in May, 1846, while the
plaintiffs were pulling down the old buildings, preparatory
to the erection of the hoe factory, he forbade the plaintiffs
to use the water power, claiming to own the water right him-

self by lease, and he delivered to Babcock a written notice to the same effect, in August thereafter.

After the erection of their new factory, the plaintiffs put the machinery therein in operation, by means of water drawn from said dam through the canal before mentioned, and the water so drawn was the only power used on said premises, from the time of the construction of the dam and canal. The factory would be substantially valueless without the benefit of that water power, and the said premises are valuable mainly for the water privilege created by said dam and canal, and used thereon.

In August, 1847, the defendant Francis A. Utter, employed the other defendants in this cause, to obstruct, and they did obstruct the flow of water from the said dam to the plaintiffs' factory; and they diverted the water from the above mentioned canal, into a bulkhead and canal constructed by them upon the opposite side of the river, upon the farm formerly owned by Henry Clarke. Such obstruction and diversion were made by said Francis A. Utter, under claim of right, under and by virtue of the lease to him above mentioned. The plaintiffs were interrupted in their business by such diversion for the space of twenty-three days, and the damages thereby were $50.

Upon these facts the referee found as conclusions of law:

1. That William Utter having constructed the dam and canal, with the license of the then owners of the land, on and over which said dam and canal were located, and having erected mills, and placed therein machinery, to be operated with the water obtained from said dam and canal, he and his grantees were entitled to the use of said water, dam and canal, for the factory then on said premises, and that the license so granted was irrevocable.

2. That the rights of Utter to said dam, canal and water, passed to Johnson, the mortgagee, by the mortgage from Utter to him, and the foreclosure and sale under such mortgage.

3. That Utter and those claiming under him, were *estopped* from asserting any claim or right under the Hilliard lease, or

by virtue of the four acres lying northerly of the mill prem-
ises.

4. That the defendant Francis A. Utter, acquired no right
to divert the water of said west branch by virtue of the lease
from Ethan Clarke, as Clarke had no title to the waters of
said branch.

5. That the plaintiffs were entitled to damages for the
diversion of said waters, and to the other relief thereafter
in the report mentioned.

Then followed a direction for judgment, declaring the right
of the plaintiffs to maintain a dam across the west branch,
where the same had theretofore stood, at the height at which
it had been maintained; to flow so much land as had been
theretofore flowed by said dam, and to maintain a canal or
ditch from said dam to the factory of the plaintiffs, at the
place where the canal had been located and used, and to
draw through such canal to their hoe factory, the quantity
of water which had been theretofore drawn through the same.
And that the defendants be perpetually enjoined from divert-
ing, or in any manner interfering with said dam and canal,
or the flow of water in and along the said canal. Also, that
the plaintiffs were entitled to recover fifty dollars damages
for the diversion of the water, and costs, against Francis A.
Utter; and that the complaint should be dismissed as against
the defendants William and Morris W. Utter.

Judgment was entered in accordance with the directions
of the report, and the defendants having excepted to the
conclusions of law found by the referee, appealed to the gen-
eral term of the supreme court, where the judgment was
affirmed, and the defendant Francis A. Utter, appealed to
this court.

The cause was submitted on printed briefs by,—

PHILO GRIDLEY, *for the appellant.*
GARDNER & BURDICK, *for the respondents.*

HENRY R. SELDEN, J.   The first question presented by this
case is, what were the rights of William Utter in this water

power, when he executed the mortgage of the eleven acres to Johnson, in August, 1831? It is in effect declared by the judgment, that the construction by him of the dam and the canal, in pursuance of the license of Henry Clarke and Thier Johnson, the construction of his mills on the eleven acres, and putting his machinery therein in operation, by water drawn from the river by means of such dam and canal, gave to him as against said Clarke and Johnson, and persons claiming under them, a right perpetually to maintain the dam and canal, and use the water, as they were then maintained and used.

This judgment rests upon the position that the license, after the construction of the dam, canal and mills, was irrevocable. If this position be sustained, then the parol license by means of the expenditure made in pursuance of it, was deprived of its character as a license, and became a grant in fee of the rights claimed by the plaintiff.

In my opinion, this conclusion is in conflict with well established principles. There are many cases in which licenses, so called, and perhaps properly so called, have been regarded as grants, in consequence of their character, and of what has been done under them; but in all such cases, with the exception of a few which have been very generally condemned, (*Browne on Stat. of Frauds*, §§ 28, 29; 3 *Kent's Com.* 453,) the rights which have been established were such as might have been granted by parol. Whenever the right claimed was such as could not be created by parol, it has been denied, whatever may have been done under the license.

The nature of both classes of licenses, those connected with grants capable of taking effect by parol, and those not thus capable, is clearly pointed out by Baron ALDERSON, in his able opinion in the case of *Wood* agt. *Leadbitter* (13 *M. & W.* 838), in the course of which he states as an illustration of the latter class, the precise case now under consideration. He says (*at p.* 845): " A mere license is revocable, but that which is called a license is often something more than a license; it often comprises, or is connected with a

grant, and then the party who has given it cannot in general revoke it, so as to defeat his grant to which it is incident. * * * But where there is a license by parol, coupled with a parol grant, or pretended grant, of something which is incapable of being granted otherwise than by deed, there the license is a mere license ; it is not an incident to a valid grant, and is, therefore, revocable. Thus, a license by A. to hunt in his park, whether given by deed or by parol, is revocable ; it merely renders the act of hunting lawful, which without the license would have been unlawful. If the license be not only to hunt, but also to take away the deer when killed, this is in truth a grant of the deer, with a license annexed to come on the land ; and supposing the grant of the deer to be good, then the license would be irrevocable by the party who had given it ; he would be *estopped* from defeating his own grant, or act in the nature of a grant. But suppose the case of a parol license to come on my lands, and there to make a water course to flow on the lands of the licensee. In such a case there is no valid grant of the water course, and the license remains a mere license, and, therefore, capable of being revoked. On the other hand, if such a license were granted by deed, then the question would be on the construction of the deed ; whether it amounted to a grant of the water course, and if it did; then the license would be irrevocable."

The cases of license to enter upon the land of the licensor, and to cut and remove trees, or to dig and carry away gravel, or to quarry and remove marble, and the like, are licenses of the class first mentioned, where the grant connected with the license when executed is valid ; the license in such cases renders lawful the entry and severance of the articles granted, which would otherwise be a trespass, and the grant operates as a gift of the severed article, a parol gift of which would be effectual upon delivery. But if under such a license to take marble, a perpetual right were asserted, on the ground that the license was irrevocable, the case would fall within the second class, and the right could not be maintained, as it could not be created or granted by parol, nor would it aid

the licensee to show that he had been induced by the license, with the knowledge of the licensor, to erect extensive works on his own adjoining land for the purpose of working the marble (*Browne on Stat. of Frauds*, §§ 27, 28).

The law in this state, and generally in the United States, as well as in England, is in entire accordance with the opinion of Baron ALDERSON, above mentioned. The subject has been so often and so fully discussed, that a review of the cases would be useless labor. *Mr. Washburn*, in his *Treatise on Real Property*, has stated with perfect accuracy the substance of the prominent cases bearing directly upon the point under discussion, and I avail myself of his summary of the cases, as sufficient for the present occasion.

He says : " In the cases of *Cook* agt. *Stearns* (11 *Mass.* 533) ; *Cowles* agt. *Kidder* (4 *Fost. N. H.* 364) ; *Stevens* agt. *Stevens* (11 *Met.* 251), and *Mumford* agt. *Whitney* (15 *Wend.* 380) the license was to erect a dam or a part of one, on the licensor's land, for raising a head of water to work a mill of the licensee, which was held to be revocable, after the dam had been erected, without reimbursing the licensee for his expenses thereby incurred. In *Morse* agt. *Copeland* (2 *Gray*, 302) ; *Hewlins* agt. *Shippam* (5 *B. & C.* 221) ; *Fentiman* agt. *Smith* (4 *East*, 107), and *Sampson* agt. *Burnside* (13 *N. H.* 264), the license was to dig a ditch or tunnel in the licensor's land, to divert the water of a stream to or from the land of the licensee, and it was held to be revocable, though executed without remuneration to the licensee for his expenses thereby incurred. In the cases of *Prince* agt. *Case* (10 *Conn.* 378), and *Jackson* agt. *Babcock* (4 *John.* 418), a license to erect a house on the licensor's land, was held to be revocable after the erection of the house. In *Hazelton* agt. *Putnam* (3 *Chand. Wis.* 117), a well considered and ably reasoned case, where the owner of lands licensed the owner of a mill site situate below these, to flow them for the working of his mill, it was held to be a revocable license after the licensee had erected his mill and dam " (1 *Washb. on Real Property*, 400, *and note*).

To the same effect are the cases of *Jamieson* agt. *Milleman*

(3 *Duer*, 255) ; *Foot* agt. *New Haven and Northhampton Co.* (23 *Conn.* 223) ; *Eggleston* agt. *New York and Harlem R. R. Co* (35 *Barb.* 162).

The decision in the court below is in conflict with all the foregoing cases, and others which might be referred to, and I think it equally in conflict with the common law rule, that an easement can only be created by deed (or its equivalent prescription), within the statute of frauds prohibiting the conveyance of any interest in lands, other than short leases, without writing (2 *R. S.* 134, § 6), and within the statute requiring deeds for the conveyance of freehold interests (1 *R. S.* 738, § 137).

In my opinion, the principle upon which the decision of the court below rests, would substantially repeal the common law rule, and the statute above referred to ; for there is no interest in lands which may not be made the subject of such irrevocable license. As has been well said by *Mr. Chitty :* " If a person could acquire a perfect right by a license, any one has only to get a person to swear to a parol license by the owner of land, to build a house upon it, and thereby, without any conveyance by deed, he would acquire in effect, all the beneficial right of an owner in fee." (1 *Gen. Prac.* 339 ; *Benedict* agt. *Benedict*, 5 *Day*, 464 ; *Browne on Stat. of Frauds*, § 29.)

We have been referred to no reported cases having any tendency to sustain the decision that the license in question was irrevocable, except those of *Rerick* agt. *Kern* (14 *S. & R.* 267), and *Hepburn* agt. *McDowell* (17 *Id.* 383). The last of these cases contains nothing inconsistent with the rule to be deduced from the cases to which I have referred, excepting the approval by the judge who delivered the opinion, of the case of *Rerick* agt. *Kern.*

The latter case, treating it as one of license and not of contract, is certainly not law in this state, if it is any where beyond the jurisdiction within which it was decided. (*Jamieson* agt. *Milleman*, 3 *Duer*, 261 ; 1 *Washburn on Real Property*, 400, *note.*)

The note of Messrs. Clark & Wallace, in the case of *Rerick*

agt. *Kern* (2 *Am. Lead. Cases*, 514, 1*st ed*). So far as an attempt is made to sustain the soundness of that decision, is not very satisfactory, and the learned authors seem not to have found much in the way of authority to support it. The effort to sustain it appears to have deprived the note of the clearness and consistency which usually. characterize the notes in that valuable work.

The English cases which have been supposed to give some support to the doctrine of irrevocability of licenses under such circumstances as this case presents, were reviewed by Baron ALDERSON, in the opinion before referred to, and their insufficiency to sustain that doctrine was clearly demonstrated.

There is another class of cases which have been invoked in support of the same doctrine, viz : where the owners of lands who have encouraged others to expend money upon them under an erroneous opinion of title, have been prohibited from afterwards asserting their legal rights (*Wendell* agt. *Van Rensselaer*, 1 *Johns. Ch.* 354). The basis of these cases is fraud on the part of the owner of the land, and where the person making the expenditure knows the state of the title, he makes it at his peril, and acquires no equitable rights against the owner thereby (*Browne on Stat. of Frauds*, § 29).

The doctrine of the presumption of a grant arising from twenty years adverse possession, has been urged in support of the plaintiff's claim ; but where one enters and holds in pursuance of a license, the holding is not adverse, and no such presumption can arise out of it.

It follows from what has been said, that the only right which William Utter possessed at the time of the execution of his mortgage to Johnson, to so much of his water power as depended upon the license of Henry Clarke, was the right to the use of such power so long as the heirs or assigns of Henry Clarke saw fit to allow such use, and no longer. That right was merely personal, and was not susceptible of conveyance to another party (*Browne on Stat. of Frauds*, § 22). Johnson, therefore, derived no title to that portion of the water power, through the mortgage of Utter. As

Henry Clarke owned upon one side of the river, and Isaiah Hilliard upon the other, where the dam was erected, each was the owner of one-half the stream, and, consequently, this deficiency of title in Johnson, extended to one-half of the water power.

As to the other half of the stream, Utter had a perfect title, so far as related to the right to maintain the dam for the long term specified in his lease from Hilliard, and to draw the water from the river, and through the canal for its whole length, excepting that part where it crossed the lands of Thier Johnson, and in that respect his right (upon the principles above laid down) depended entirely upon the pleasure of Thier Johnson, or of those who may have become his successors. That right too, derived from the license of Thier Johnson, was merely personal, and did not pass by force of the mortgage to William Johnson.

Utter, however, had power to convey the entire right to this half of the water power, subject to the right of Thier Johnson to revoke the license allowing the maintenance of the canal, and the flow of water across his land.

The question then arises, whether by the mortgage to Johnson, Utter conveyed all the right which he possessed in this half of the water power (which would give to the mortgagee a perfect title, with the exception of the right to maintain the canal and conduct the water across Thier Johnson's land), or only so much of his right as was comprised within the boundaries of the eleven acres described in the mortgage.

I entertain no doubt upon this question. At the time when the mortgage was executed, the mill was in operation, its machinery being driven by water drawn from the river, by means of the dam and canal, and such right to the water power as the mortgagor possessed, not depending upon mere license, and, therefore, incapable of conveyance, passed by the mortgage to the mortgagee (*Huttemeier* agt. *Albro*, 18 *N. Y.* 48). It is not material in this respect that the conveyance does not contain the word "appurtenances," or any equivalent expression, nor that it contains no reference to

the mill. The deed is to be interpreted as though it had been executed and delivered between the parties in view of the premises ; and thus interpreted, it must be held to convey the mill, *as such,* as fully and completely as if it had been expressly named in the grant ; and with the mill, all the appurtenances which at the time were connected with it, and which gave it its value as a mill, so far as the grantor had power to convey the same. This is expressly decided in the case of *Oakley* agt. *Stanley* (5 *Wend.* 523), and there is nothing in the judgment in the case of *Tabor* agt. *Bradley* (18 *N. Y.* 109), under the peculiar circumstances disclosed in that case, which is inconsistent with this position.

William Johnson, therefore, by virtue of his mortgage, and its foreclosure, obtained a title to one-half of the water power, subject to the right of Thier Johnson to stop the flow of the stream across his premises at pleasure, and, perhaps, subject also to a forfeiture of his right to the water in case of default in payment of the rent on the lease of Hilliard. The conveyance of the mill did not operate as an assignment of the whole interest of the lessee in the demised premises, but only of his right to maintain the dam and canal, and to conduct the water across such premises. If the lands leased possessed value for any other purpose, to that extent the interest of the lessee was not affected by the mortgage to Johnson, but passed to Francis A. Utter, on the assignment of the lease to him. The rent in such case would doubtless be apportioned between the assignees, according to the value of their several interests. (*Gilbert on Rents,* 153 ; 3 *Kent's Com.* 470 ; *Van Rensselaer* agt. *Bradley,* 3 *Denio,* 143.)

This qualified title to one-half the waters of the river was vested in the plaintiffs at the time of the commencement of the action, and it constituted the extent of their *title* to the water power which they were using at the time of the interference by the defendants. What right they had as licensees or otherwise, to the other half of the waters of the river, depends upon the state of the title to that half, which is next to be considered.

It has already been shown that the title to one-half the waters of the river, notwithstanding the license to Utter, and what was done by him in pursuance of such license, remained in Henry Clarke at the time of his death, as he had the right at any time during his life to revoke the license, remove the dam, and apply the waters to any use, or allow them to flow in their natural channel. This title passed by his will to his three sons, and remains in them still, so far as the case shows, unless it passed to Ethan Clarke, by virtue of the conveyance of the farm by them to him on the 7th of May, 1831. The description in that conveyance begins, " at a stake and stones on the west bank of the Unadilla river," as a starting point in the boundary line, and runs thence by courses and distances around the farm, until it comes again " to the Unadilla river," and runs " thence down the west bank of the Unadilla river, as it winds and turns, to the place of beginning."

The words, " to the Unadilla river," according to the usual interpretation of such an expression in conveyances, would carry the line to the centre of the river, as the general rule is, that where a line touches a river it goes to the centre; but the words are entirely consistent with an interpretation which should stop the line at the margin or bank of the river; and whether the one or the other interpretation should be given to them, must depend upon the apparent intention of the parties, to be determined by reference to the other portions of the deed.

The other expressions of the deed which have reference to the river, I think show a clear intention to limit the operation of the grant to the bank of the river. The starting point is unequivocally from " the bank," and not from the centre of the river, and if the last line in the description is confined to the centre of the river, it cannot run " to the place of beginning," as the description requires; and if it starts from the centre of the river, and runs " to the place of beginning," it would neither follow the centre of the river, nor " the west bank as it winds and turns," according to the description of the deed. From the terms of the deed

alone, I think it must be held to convey the farm to the west bank of the river only, leaving the title to the river and the land covered by it in the grantors. (*See Child* agt. *Starr*, 4 *Hill*, 369.)

This construction is strongly confirmed by the circumstances which may properly be considered as bearing upon the interpretation of the deed, that the river was at the time of the execution of the deed by the grantors, controlled and used by their father's friend, in pursuance of a license granted by him ten years before his death, and which he had not seen fit during his lifetime, nor the grantors, his sons, after his death, to revoke.

It will thus be seen that the right to that part of the water which is not vested in the plaintiffs, remains in the three sons, devisees of Henry Clarke. Ethan Clarke obtained no title to it by his deed from them, and consequently, conveyed none by his demise to Francis A. Utter. The defendants, therefore, were entirely without any right to interfere with the dam, or to divert the water of the river from the plaintiffs' factory.

The only remaining question is, whether the plaintiffs are entitled to recover damages for the diversion of the water. It appears that the whole stream was diverted from their factory, and as their title to half of it was complete, so long as Mr. Thier Johnson allowed it to flow across his premises, there can be no doubt of their right to recover the damages occasioned by the diversion of such half. In regard to the other half, their rights, so long as the license to use it remained unrevoked, was a perfect possessory right, sufficient to sustain an action for its diversion, against strangers.

The referee reported that the license had never been revoked, by which I understand that there had been no direct revocation by Henry Clarke or his successors in interest. The death of the original licensor was itself a revocation (1 *Washbnrn on Real Property*, 399, § 9), but it was optional with his devisees to enforce the revocation, or renew or continue the license, and their acquiescence in the use of the water by the licensee and his successors, from the death of

Babcock agt. Utter.

their father in 1831, until the time of the commencement of this action in 1847, without interfering with or forbidding such use, may doubtless be regarded as sufficient evidence of the confirmation of the license by them, in favor of the successive occupants of the mills. The plaintiffs were, therefore, entitled to recover the damages which they sustained by the diversion of the water, unless a revocation of the license by the devisees of Henry Clarke, prior to such diversion, can be shown. As the license was held irrevocable on the former trial, there was no object in the introduction of proof of such revocation, if it existed, as it would have been under that ruling wholly unavailing.

The judgment of the supreme court should be reversed, and a new trial should be granted as against the defendant Francis A. Utter, the costs to abide the event.

The defendant Ethan Clarke, has not appealed from the judgment of the general term of the supreme court, and that judgment as against him remains undisturbed.

Isaiah Hilliard, who is named in the papers as a defendant, does not appear to have been served with process, or to have appeared voluntarily, and he is not, therefore, a party to the action.

The judgment dismissing the complaint as against the defendants William Utter and Morris W. Utter, has not been appealed from, consequently they have ceased to be parties, although their names are still continued in the papers.

In all future proceedings Francis A. Utter alone, will be the only proper party defendant.

All the judges concurring, judgment reversed.