Henry H. Babcock, and others, Respondents, *v*. Francis A. Utter, and others, Appellants.

A parol license cannot be regarded as a grant in fee, whenever the rights claimed thereunder are such as cannot be created by parol.

But if the parol license be accompanied by a parol grant of that which is capable of passing by parol, then the license may be deemed a part of the grant.

Thus, a parol license to enter upon the land of the licensor, to sever from the freehold and take certain articles, might be good; but if such license were claimed to be perpetual, it would not be good, as such an estate cannot be created by parol.

Where one enters upon land and holds under a license, his possession is not adverse, and no presumption arises from such holding.

Where the mortgagor, being in possession of the premises, mortgages the same without using the word "appurtenances," his entire legal estate in the premises is included in the mortgage, the same as if the word "appurtenances" had been used in the usual manner.

This action was commenced by the plaintiffs in the Supreme Court in equity, in September, 1847, to have their right to a stream of water declared and established; to obtain a perpetual injunction against the diversion of the stream from their factory, and to recover damages for previous diversions.

The facts appearing from the pleadings and the report of the referee before whom the cause was tried, so far as they have any material bearing upon the questions presented on the present appeal, are substantially as follows:

On and prior to April 1, 1820, William Utter, one of the defendants, was the owner of eleven acres of land in the town of Plainfield, Otsego county, and also of another lot of four acres north of and adjoining the eleven acres, both pieces being bounded on the west by the west branch of Unadilla river. In the year 1821, said Utter in contemplation of erecting carding and cloth-dressing works on the eleven acres, constructed a dam across said west branch, on lands some distance north of his own, which were owned by Henry Clarke on the west side, and by Isaiah Hilliard on the east side of said branch. During the same year he constructed a canal from said dam, southerly across the lands of

said Hilliard, of Thier Johnson, and the two pieces of four and eleven acres before mentioned, to the southerly side of the eleven acres, for the purpose of propelling machinery thereafter to be placed on said premises, with water to be drawn from the dam, through said canal. In 1821, or 1822, he erected on the eleven acres a saw-mill and carding and cloth-dressing works, and placed therein machinery proper to be used in such works, and put the same in operation, the propelling power being the water drawn from the dam, through said canal. In 1824, he obtained, from Isaiah Hilliard, a lease for the term of ten thousand years, of three-quarters of an acre of land, on which the east end of the dam stood, together with the right of flowing so much of the land of said Hilliard as would be flowed by a dam five feet six inches high, measuring from the bed of the stream, at an annual rent of $7. The canal was made over the lands embraced in this lease. Henry Clarke verbally consented to the abutting of the west end of the dam on his land, and the canal was constructed across the land of Thier Johnson, with his assent, and the license so given by Clarke and Johnson the referee finds has never been revoked.

William Utter, and those claiming under him, used said saw-mill and clothing works, and carried on the business of sawing lumber and dressing cloth therein, by means of water drawn through said canal, and from no other source, until August, 1831; and there was no other source from which water for that purpose could be obtained.

In August, 1831, said Utter executed and delivered to William Johnson a mortgage upon the eleven acres upon which the mills and machinery stood, describing them by metes and bounds, but without the word " appurtenances," or other equivalent words, and without any reference to the mills or machinery, or any improvements upon the land. The mortgage was duly acknowledged and recorded, and became a valuable lien upon the premises. At the time when the mortgage was given, the mills and machinery were in use, and the water for propelling such machinery was drawn from the said canal.

On the 15th of December, 1834, there was due upon the mortgage $2,611.55; and he thereupon proceeded to foreclose the mortgage by advertisement, pursuant to the statute, and on the 2d of June, 1835, the premises were sold at auction, in accordance with the advertisement, and purchased by the mortgagee. Johnson, by his tenants, occupied the said premises, mills and machinery, from the time of his purchase until April 10, 1846, when he entered into a contract with the plaintiff, Babcock, for the sale of the premises to him for the consideration of $1,100, and gave him immediate possession. In the following August, the purchase price having been paid, Johnson, by quitclaim deed, conveyed the premises to Babcock, who, in November thereafter, conveyed five-sixths thereof to his five co-plaintiffs in this action, the purchase having been made originally for the use of all those parties.

The plaintiffs removed the buildings used by Utter for a saw-mill and clothing works, and erected in their stead a valuable building for a hoe factory, and used the same for the manufacture of hoes, propelling the machinery with water taken from the dam erected by Utter, and through the canal constructed by him.

William Utter and others, who occupied the 11 acres and used the mills and machinery thereon, found it necessary on several occasions to repair the dam, and for that purpose to use gravel from a pit on the farm of Henry Clarke, or those claiming under him, and before making such repairs on some of those occasions, leave to go upon the farm to get gravel for that purpose was asked of the owners or occupants and granted. On some two or three or more occasions, while William Utter was in possession, permission was asked from Henry Clarke, to go upon his land to repair the dam. The right of Utter and those claiming under him, to maintain the dam and canal, or ditch, and draw water through the ditch, was never called in question by any of the owners of the lands, on which the dam abutted, and over which said canal or ditch was dug, until after the contract was entered into

between Johnson and Babcock, in April, 1846, for the purchase by the latter of the 11 acres.

Henry Clarke, who was the relative and intimate friend of William Utter, died in 1831, seized of the farm on which the west end of the dam in question stood, leaving a will, duly executed, by which he devised the farm to his three sons. On the 27th of May, in the same year, and after the death of their father, the three sons conveyed the farm to Ethan Clarke, one of the defendants in this action, but bounding him by the westerly bank of said river, instead of by the center, to which the farm extended, as described in the patent from the State to said Henry Clarke. The material part of the descriptive portion of the deed to Ethan Clarke, is as follows, viz. : " Beginning at a stake and stones on the west bank of Unadilla river, at the north corner of widow Clarke's farm ; thence south five chains and thirteen links, to a stake and stones; thence," etc. [giving a great number of courses and distances, the two last of which are as follows] : " thence north, eighty-five degrees east, twenty-four chains and thirty-four links, to the Unadilla river ; thence down the west bank of the Unadilla river, as it winds and turns, to the place of beginning, containing," etc.

In March, 1839, William Utter, in consideration of $50, assigned to the defendant, Francis A. Utter, and Jacob S. Utter, the above-mentioned lease from Hilliard, and in August, 1846, Jacob S. Utter assigned his interest to said Francis A.

On the 4th of May, 1846, Ethan Clarke, the grantee above mentioned granted to said Francis A. Utter, by an instrument in writing under his hand and seal, in consideration of the sum of $15 to be thereafter annually paid by said Utter, the exclusive privilege of maintaining so much of the aforesaid mill-dam as was located on said Clarke's premises ; also the privilege of controlling the water by dams and dikes to the center of said west branch for fifteen rods above the dam ; also the privilege of controlling said water down said west branch along its bank, to the center of the stream, to the south-east corner of said Clarke's land ; also the privi-

lege of taking earth or gravel from the bank, as had been theretofore accustomed, for repairing the dam, with the privilege of access to the gravel bank.

Before this lease was obtained, Francis A. Utter had been informed that Babcock had a contract for the purchase of the mill property; and some time in May, 1846, while the plaintiffs were pulling down the old buildings preparatory to the erection of the hoe factory, he forbade the plaintiffs to use the water-power, claiming to own the water-right himself by lease; and he delivered to Babcock a written notice to the same effect, in August thereafter.

After the erection of their new factory the plaintiffs put the machinery therein in operation by means of water drawn from said dam through the canal before mentioned, and the water so drawn was the only power used on said premises from the time of the construction of the dam and canal. The factory would be substantially valueless without the benefit of that water-power, and the said premises are valuable mainly for the water-privilege created by said dam and canal, and used thereon.

In August, 1847, the defendant, Francis A. Utter, employed the other defendants in this cause to obstruct, and they did obstruct the flow of water from the said dam to the plaintiff's factory; and they diverted the water from the above-mentioned canal into a bulkhead and canal constructed by them upon the opposite side of the river, upon the farm formerly owned by Henry Clarke. Such obstruction and diversion were made by said Francis A. Utter, under claim of right, under and by virtue of the lease to him above mentioned. The plaintiffs were interrupted in their business by such diversion for the space of twenty-three days, and the damages thereby were $50.

Upon these facts the referee found as conclusions of law:

1. That William Utter, having constructed the dam and canal, with the license of the then owners of the land, on and over which said dam and canal were located, and having erected mills and placed therein machinery, to be operated with water obtained from said dam and canal, he

and his grantees were entitled to the use of said water, dam and canal, for the factory then on said premises, and that the license so granted was irrevocable.

2. That the right of Utter to said dam, canal and water, passed to Johnson, the mortgagee, by the mortgage from Utter to him, and the foreclosure and sale under such mortgage.

3. That Utter and those claiming under him were estopped from asserting any claim or right under the Hilliard lease, or by virtue of the four acres lying northerly of the mill premises.

4. That the defendant, Francis A. Utter, acquired no right to divert the water of said west branch, by virtue of the lease from Ethan Clarke, as Clarke had no title to the waters of said branch.

5. That the plaintiffs were entitled to damages for the diversion of said waters, and to the other relief, thereafter in the report mentioned. Then followed a direction for judgment, declaring the right of the plaintiffs to maintain a dam across the west branch at the place where the same had theretofore stood, at the height at which it had been maintained; to flow so much land as had been heretofore flowed by said dam, and to maintain a canal or ditch from said dam to the factory of the plaintiffs, at the place where the canal had been located and used, and to draw through such canal to their hoe factory, the quantity of water which had been theretofore drawn through the same. And that the defendants be perpetually enjoined from diverting, or in any manner interfering with said dam and canal, or the flow of water in and along the said canal. Also, that the plaintiffs were entitled to recover $50 damages for the diversion of the water, and costs, against Francis A. Utter, and that the complaint should be dismissed as against the defendants William and Morris W. Utter.

Judgment was entered in accordance with the directions of the report, and the defendants, having excepted to the conclusions of law found by the referee, appealed to the General Term of the Supreme Court, where the judgment was affirmed, and the defendant, Francis A. Utter, appealed to this court. The cause was submitted on printed briefs.

*Philo Gridley,* for the appellant.

*Gardner & Burdick,* for the respondents.

SELDEN, J. The first question presented by this case is, what were the rights of William Utter in this water-power, when he executed the mortgage of the eleven acres to John-son, in August, 1831? It is in effect declared by the judg-ment, that the construction by the plaintiff of the dam and the canal in pursuance of the license of Henry Clarke and Thier Johnson, the construction of his mills on the eleven acres, and putting his machinery therein in operation by water drawn from the river by means of such dam and canal, gave to him, as against said Clark and Johnson and persons claiming under them, a right perpetually to main-tain the dam and canal and use the water as they were then maintained and used. This judgment rests upon the position that the license, after the construction of the dam, canal and mills, was irrevocable. If this position be sustained, then the parol license, by means of the expenditure made in pursuance of it, was deprived of its character as a license and became a grant in fee of the rights claimed by the plaintiff. In my opinion this conclusion is in conflict with well-established principles. There are many cases in which licenses, so called, and perhaps properly so called, have been regarded as grants, in consequence of their character, and of what has been done under them; but in all such cases, with the exception of a few which have been very generally condemned (Brown on Stat. of Frauds, §§ 28, 29 ; 3 Kent's Com., 453), the rights which have been established were such as might have been granted by parol. Whenever the right claimed was such as could not be created by parol, it has been denied, whatever may have been done under the license. The nature of both classes of licenses, those connected with grants capable of taking effect by parol, and those not thus capable, is clearly pointed out by Baron ALDERSON, in his able opinion in the case of *Wood* v. *Leadbitter* (13 M. & W., 838), in the course of which he states as an illustration of the latter class, the pre-cise case now under consideration.

He says (at p. 845), " A mere license is revocable; but that which is called a license is often something more than a license—it often comprises or is connected with a grant, and then the party who has given it cannot in general revoke it so as to defeat his grant, to which it is incident.   *   *   But where there is a license by parol, coupled with a parol grant, or pretended grant of something which is incapable of being granted otherwise than by deed, there the license is a mere license; it is not an incident to a valid grant, and is therefore revocable.   Thus a license by A to hunt in his park, whether given by deed or by parol, is revocable; it merely renders the act of hunting lawful, which without the license would have been unlawful.   If the license be not only to hunt, but also to take away the deer when killed, this is in truth a grant of the deer, with a license annexed to come on the land; and supposing the grant of the deer to be good, then the license would be irrevocable by the party who had given it; he would be estopped from defeating his own grant, or act in the nature of a grant.   But suppose the case of a parol license to come on my lands, and there to make a water-course to flow on the lands of the licensee.   In such a case there is no valid grant of the water-course, and the license remains a mere license, and therefore capable of being revoked.   On the other hand, if such a license were granted by deed, then the question would be on the construction of the deed, whether it amounted to a grant of the water-course; and if it did, then the license would be irrevocable."   The cases of license to enter upon the land of the licenser, and to cut and remove trees, or to dig and carry away gravel, or to quarry and remove marble, and the like, are licenses of the class first mentioned, where the grant connected with the license, when executed, is valid.   The license in such cases renders lawful the entry and severance of the article granted, which would otherwise be a trespass, and the grant operates as a gift of the severed article, a parol gift of which would be effectual upon delivery.   But if under such a license to take marble a perpetual right were asserted, on the ground that the license was irrevocable, the case would fall within the

second class, and the right could not ·be maintained, as it could not be created or granted by parol; nor would it aid the licensee to show that he had been induced by the license, with the knowledge of the licenser, to erect expensive works on his own adjoining land, for the purpose of working the marble. (Browne on Stat. of Frauds, §§ 27, 28.)

The law in this·State, and generally in the United States, as well as in England, is in entire accordance with the opinion of Baron ALDERSON, above mentioned. The subject has been so often and so fully discussed, that a review of the cases would be a useless labor. ·Mr. Washburn, in his Treatise on Real Property, has stated with perfect accuracy the substance of prominent cases bearing directly upon the point under discussion, and I avail myself of his summary of the cases, as sufficient for the present occasion. . He says : " In the cases of *Cook* v. *Stearns* (11 Mass., 533) ; *Cowles* v. *Kibber* (4 Fost. [N. H.], 364) ; *Stevens* v. *Stevens* (11 Metc., 251), and *Munford* v. *Whitney* (15 Wend., 380), the license was to erect a dam or a part of one on the licenser's land, for raising a head of water to work a mill of the licensee, which was held to be revocable after the dam had been erected, without reimbursing the licensee for his expenses thereby incurred. In *Morse* v. *Copeland* (2 Gray, 302) ; *Hewlins* v. *Shippam* (5 B. & C., 221) ; *Fentiman* v. *Smith* (4 East., 107) ; and *Sampson* v. *Burnside* (13 N. H., 264), the license was to dig a ditch or tunnel in the licenser's land, to divert the water of a stream to or from the land of the licensee, and it was held to be revocable, though executed, without remuneration to the licensee for his expenses thereby incurred. In the cases of *Prince* v. *Case* (10 Conn., 378), and *Jackson* v. *Babcock* (4 Johns., 418), a license to erect a house on the licenser's land was held to be revocable after the erection of the house. In *Hazleton* v. *Putnam* (3 Chand. [Wis.], 117), a well considered and ably reasoned case, where. the owner of lands licensed the owner of a mill site situate below these to flow them for the working of his mill, it was held to be a revocable license after the licensee had erected his mill and dam." (1 Washb. on Real Property, 400, *note*.) To the

same effect are the cases of *Jamieson* v. *Milleman* (3 Duer., 255); *Foot* v. *New Haven and Northampton Company* (23 Conn., 223); *Eggleston* v. *New York and Harlem Railroad Company* (35 Barb., 162). The decision in the court below is in conflict with all the foregoing cases, and others which might be referred to, and I think it equally in conflict with the common law rule, that an easement can only be created by deed (or its equivalent prescription), with the statute of frauds, prohibiting the conveyance of any interest in lands, other than short leases, without writing (2 R. S., 134, § 6), and with the statute requiring deeds for the conveyance of freehold interests. (1 R. S., 738, § 137.)

In my opinion, the principle upon which the decision of the court below rests, would substantially repeal the common law rule and the statutes above referred to; for there is no interest in lands which may not be made the subject of such irrevocable license. As has been well said by Mr. Chitty, " If a person could acquire a perfect right by a license, any one has only to get a person to swear to a parol license by the owner of land to build a house upon it, and thereby without any conveyance by deed, he would acquire, in effect, all the beneficial right of an owner in fee." (1 Gen. Prac., 339; *Benedict* v. *Benedict*, 5 Day, 464; Browne on Stat. of Frauds, § 29.)

We have been referred to no reported cases having any tendency to sustain the decision that the license in question was irrevocable, except those of *Revick* v. *Kern* (14 S. & R., 267) and *Hepburn* v. *McDowell* (17 id., 383). The last of these cases contains nothing inconsistent with the rule to be deduced from the cases to which I have referred, excepting the approval by the judge who delivered the opinion, of the case of *Revick* v. *Kern*. The latter case, treating it as one of license and not of contract, is certainly not law in this State, if it is anywhere beyond the jurisdiction within which it was decided. (*Jamieson* v. *Milleman*, 3 Duer., 261; 1 Washb. on Real Property, 400, *note*.) The note of Messrs. Clark and Wallace, to the case of *Revick* v. *Kern*, (2 Am. Lead. Cases, 514, 1st ed.), so far as an attempt is made to

sustain the soundness of that decision, is not very satisfactory in its reasoning, and the learned authors seem not to have found much in the way of authority to support it. The effort to sustain it appears to have deprived the note of the clearness and consistency which usually characterize the notes in that valuable work.

The English cases which have been supposed to give some support to the doctrine of the irrevocability of licenses under such circumstances as this case presents, were reviewed by Baron ALDERSON, in the opinion before referred to, and their insufficiency to sustain that doctrine was clearly demonstrated.

There is another class of cases which have been invoked in support of the same doctrine; viz.: where the owners of lands who have encouraged others to expend money upon them, under an erroneous opinion of title, have been prohibited from afterward asserting their legal rights. (*Wendell* v. *Van Rensselaer*, 1 Johns. Ch., 354.) The bases of these cases is fraud on the part of the owner of the land; and where the person making the expenditure knows the state of the title, he makes it at his peril, and acquires no equitable rights against the owner thereby. (Browne on Stat. of Frauds, § 29.)

The doctrine of the presumption of a grant arising from twenty years' adverse possession, has been urged in support of the plaintiffs' claim; but where one enters and holds in pursuance of a license, the holding is not adverse, and no such presumption can arise out of it. It follows from what has been said, that the only right which William Utter possessed at the time of the execution of his mortgage to Johnson, to so much of his water-power as depended upon the license of Henry Clarke, was the right to the use of such power so long as the heirs or assigns of Henry Clarke saw fit to allow such use, and no longer. That right was merely personal, and was not susceptible of conveyance to another party. (Browne on Stat. of Frauds, § 22.) Johnson, therefore, derived no title to that portion of the water-power through the mortgage of Utter. As Henry Clarke owned

upon one side of the river, and Isaiah Hilliard upon the other, where the same was erected, each was the owner of one-half the stream, and consequently this deficiency of title in Johnson extended to one-half of the water-power.

As to the other half of the stream, Utter had a perfect title so far as related to the right to maintain the dam for the long term specified in his lease from Hilliard, and to draw the water from the river, and through the canal for its whole length, excepting that part where it crosses the lands of Thier Johnson, and in that respect his right (upon the principles above laid down) depended entirely upon the pleasure of Thier Johnson, or of those who may have become his successors. That right, too, derived from the license of Thier Johnson, was merely personal, and did not pass by force of the mortgage to William Johnson.

Utter, however, had power to convey the entire right to his half of the water-power, subject to the right of Thier Johnson to revoke the license allowing the maintenance of the canal and the flow of the water across his land.

The question then arises, whether, by the mortgage to Johnson, Utter conveyed all the right which he possessed in this half of the water-power (which would give to the mortgagee a perfect title, with the exception of the right to maintain the canal and conduct the water across Thier Johnson's land), or only so much of his right as was comprised within the boundaries of the eleven acres described in the mortgage. I entertain no doubt upon this question. At the time when the mortgage was executed, the mill was in operation, its machinery being driven by water drawn from the river, by means of the dam and canal, and such right to the water-power as the mortgagor possessed, not depending upon mere license, and therefore incapable of conveyance, passed by the mortgage to the mortgagee. (*Huttemeier* v. *Albro*, 18 N. Y., 48.) It is not material in this respect, that the conveyance does not contain the word "appurtenances," or any equivalent expresssion, nor that it contains no reference to the mill. The deed is to be interpreted as though it had been executed and delivered between the parties in view of the premises,

and thus interpreted, it must be held to convey the mill, *as such*, as fully and completely as if it had been expressly named in the grant, and with the mill, all the appurtenances, which were at the time connected with it, and which gave it its value as a mill, so far as the grantor had power to convey the same. This is expressly decided in the case of *Oakley* v. *Stanley* (5 Wend., 523), and there is nothing in the case of *Tabor* v. *Bradley* (18 N. Y., 109), under the peculiar circumstances disclosed in that case, which is inconsistent with this position.

William Johnson, therefore, by virtue of his mortgage and its foreclosure, obtained a title to one-half of the water-power subject to the right of Thier Johnson, to stop the flow of the stream across his premises at pleasure, and perhaps subject also to a forfeiture of his right to the water in case of default in payment of the rent on the lease of Hilliard. The conveyance of the mill did not operate as an assignment of the whole interest of the lessee in the demised premises, but only of his right to maintain the dam and canal, and to conduct the water across such premises. If the lands leased possessed value for any other purpose, to that extent the interest of the lessee was not affected by the mortgage to Johnson, but passed to Francis A. Utter on the assignment of the lease to him. The rent in such case would doubtless be apportioned between the assignees according to the value of their several interests. (Gilbert on Rents, 153; 3 Kent's Com., 470; *Van Rensselaer* v. *Bradley*, 3 Denio, 143.)

This qualified title to one-half the waters of the river was vested in the plaintiffs at the time of the commencement of the action, and it constituted the extent of their *title* to the water-power which they were using at the time of the interference by the defendants. What right they had as licensees or otherwise to the other half of the waters of the river, depends upon the state of the title to that half which is next to be considered.

It has already been shown that the title to one-half the waters of the river, notwithstanding the license to Utter, and what was done by him in pursuance of such license, remained

in Henry Clarke at the time of his death, as he had the
right at any time during his life to revoke the license, remove
the dam and apply the waters to any use, or allow them to
flow in their natural channel. This title passed by his will
to his three sons, and remains in them still, so far as the
case shows, unless it passed to Ethan Clarke, by virtue of the
conveyance of the farm by them to him on the 7th of May,
1831. The description in that conveyance begins, " at a
stake and stones on the west bank of the Unadilla river," as
a starting point in the boundary line, and runs thence by
courses and distances around the farm until it comes again
" to the Unadilla river," and runs " thence down the west
bank of the Unadilla river as it winds and turns, to the
place of beginning." The words " to the Unadilla river,"
according to the usual interpretation of such an expression
in conveyances, would carry the line to the center of the
river, as the general rule is that where a line touches a river
it goes to the center ; but the words are entirely consistent
with an interpretation which should stop the line at the
margin or bank of the river : and whether the one or the
other interpretation should be given to them must depend
upon the apparent intention of the parties, to be determined
by reference to the other portions of the deed. The other
expressions of the deed which have reference to the river I
think show a clear intention to limit the operation of the
grant to the bank of the river. The starting point is une-
quivocally from " the bank," and not from the center of the
river, and if the last line in the description is confined to
the center of the river, it cannot run " to the place of begin-
ning," as the description requires ; and if it starts from the
center of the river, and runs " to the place of beginning," it
would neither follow the center of the river nor " the west
bank as it winds and turns," according to the description in
the deed. From the terms of the deed alone, I think it must
be held to convey the farm to the west bank of the river
only, leaving the title to the river and the land covered by
it in the grantors. (See *Childs* v. *Starr*, 4 Hill., 369.) This
construction is strongly confirmed by the circumstances

which may properly be considered as bearing upon the interpretation of the deed, that the river was at the time of the execution of the deed by the grantors controlled and used by their father's friend, in pursuance of license granted by him ten years before his death, and which he had not seen fit during his lifetime, nor the grantors, his sons, after his death, to revoke.

It will thus be seen that the right to that part of the water which is not vested in the plaintiffs remains in the three sons, devisees, of Henry Clarke. Ethan Clarke obtained no title to it by his deed from them, and consequently conveyed none by his demise to Francis A. Utter. The defendants, therefore, were entirely without right to interfere with the dam, or to divert the water of the river from the plaintiffs' factory. The only remaining question is whether the plaintiffs are entitled to recover damages for the diversion of the water. It appears that the whole stream was diverted from their factory, and as their title to half of it was complete, so long as Mr. Thier Johnson allowed it to flow across his premises, there can be no doubt of their right to recover the damages occasioned by the diversion of such half. In regard to the other half, their right, so long as the license to use it remained unrevoked, was a perfect possessory right, sufficient to sustain an action for its diversion against strangers. The referee reported that the license had never been revoked, by which I understand that there had been no direct revocation by Henry Clarke, or his successors in interest. The death of the original licenser was itself a revocation (1 Washburn on Real Property, 399 section 9), but it was optional with his devisees to enforce the revocation, or renew or continue the license, and their acquiescence in the use of the water by the licensee and his successors, from the death of their father in 1831, until the time of the commencement of this action in 1847, without interfering with or forbidding such use, may doubtless be regarded as sufficient evidence of the confirmation of the license, by them, in favor of the successive occupants of the mills. The plaintiffs were, therefore, entitled to recover the damages which they sustained by the diversion of

the water, unless a revocation of the license by the devisees of Henry Clarke, prior to such diversion, can be shown. As the license was held irrevocable on the former trial, there was no object in the introduction of proof of such revocation, if it existed, as it would have been, under that ruling, wholly unavailing.

The judgment of the Supreme Court should be reversed and a new trial should be granted, as against the defendant Francis A. Utter, with costs to abide the event.

The defendant, Ethan Clarke, has not appealed from the judgment of the General Term of the Supreme Court, and that judgment as against him remains undisturbed.

Isaiah Hilliard, who is named in the papers as a defendant, does not appear to have been served with process, or to have appeared voluntarily, and he is not therefore a party to the action. The judgment dismissing the complaint as against the defendants, William Utter and Morris W. Utter, has not been appealed from; consequently they have ceased to be parties, although their names are still continued in the papers. In all future proceedings Francis A. Utter, alone will be the only proper party defendant.

All the judges concurring, except HOGEBOOM.

Judgment reversed.

HOGEBOOM, J. This is an appeal by the defendant, Francis A. Utter, from a judgment for the plaintiffs, entered upon the report of a referee, and affirmed by the Supreme Court at General Term.

The action was brought to establish and declare the rights of the plaintiffs in and to a certain water-power, arising in, and flowing from, the Unadilla river, in the county of Otsego, to restrain the defendants from the diversion of the water, and to recover damages for the diversion already made. The judgment appealed from was in favor of the plaintiffs in all these particulars.

The rights claimed by the plaintiffs and sustained by the judgment, are to maintain a dam across the west branch of the Unadilla river, and a canal or ditch leading therefrom to

the hoe factory of the plaintiffs, some distance below; and to pass through such canal so much of the waters of the Unadilla river as shall be necessary to operate the plaintiffs' works in the manner, and to the extent they have been hitherto enjoyed.

The dam was erected in 1821, across the Unadilla river, by William Utter, who did not own the lands on either side of the stream at that point; the dam on the north or west shore resting on lands of Henry Clarke, and on the south or east shore, on lands of Isaiah Hilliard. The canal passed southerly from the south side of the stream through lands of Isaiah Hilliard, then into and through those of Thier Johnson; then into and through a four acre lot of William Utter; then into an eleven acre lot of William Utter, on which last mentioned premises the factory of the plaintiffs is situated.

The plaintiffs claim title thereto, and to the water-power in question through William Utter. Utter having mortgaged the eleven acre lot at an early day, and after he had erected his manufacturing works, to William Johnson, Johnson having foreclosed the mortgage, and on such foreclosure became the purchaser, and having subsequently conveyed the same to the plaintiffs.

The defendants claim under Henry Clarke, who died in 1831, having devised the premises on the west side of the river, on which the plaintiffs' dam abutted, to his three sons. They conveyed to Ethan Clarke, and the latter granted to Francis A. Utter, by an instrument under seal, the exclusive privilege of maintaining so much of the mill as was located on said Clarke's premises, and also the privilege of controlling the water by dams and dykes to the center of the stream, for fifteen rods above the dam, and below the dam to the south-eastern terminus of Clarke's land. A question is made whether the deed to Ethan Clarke carried him further east than to the west bank of the stream, instead of to the center, as the defendants claim. This question, if important, will be subsequently considered.

The defendants also make claim to the land where the dam is located, and adjoining the same on the south or east

side of the stream. This claim is through William Utter, who in 1824 obtained a lease of the same from Isaiah Hilliard (the then owner)· for 10,000 years. In 1839 William Utter, in consideration of $50 advanced by Francis A. Utter, assigned to him and to his brother, Jacob Sherrill Utter, the lease above mentioned, from Hilliard to William ·Utter.

Francis A. Utter is the principal defendant, and the other defendants are made parties to the suit as having co-operated with him in the act of tapping the dam and diverting the water, which led to the institution of the suit.

The defendants thus claim to have had the ownership and the rightful control of both banks of the stream at the places where the dam at its opposite extremities touched the shore, and consequently to have had the legal right to control the dam, and, if they pleased, to divert the water, inasmuch as the plaintiffs are not riparian proprietors on the stream below. They further claim that, whether their acts were lawful or unlawful, they are not answerable to the plaintiffs, whom they insist not to be either the lawful proprietors of the dam, or of the water-power, or of the right to divert and draw the water through the canal to their works.

The plaintiffs' claim arises in this wise: When William Utter built his dam across the river, in 1821, and before he constructed the same, he obtained the verbal consent and permission of Henry Clarke to abut the north or west end of his dam on his land. This license was never revoked. On the opposite side of the stream William Utter, as before stated, obtained from Hilliard, in 1824, a lease of the land for 10,000 years. He also obtained from Thier Johnson, across whose lands the canal passed after leaving those of Hilliard, a verbal consent to construct said canal across his lands. This license has never been revoked. The residue of the lands over which the canal passed, being the four acre lot and the eleven acre lot, were lands belonging to William Utter himself.

"In 1821 or 1822, William Utter erected on the eleven acre lot a saw-mill and carding and cloth-dressing works, and placed therein machinery proper to be used in such works,

and operated the same, the propelling power being the water drawn from said dam through said canal."

So far as appears, this use of the dam, the water, the canal, the mills and machinery, continued without objection or interruption up to 1846. In that year the plaintiff Babcock, for the benefit of all the plaintiffs, contracted to purchase the same from the then owner, Johnson, and in August, 1846, obtained from Johnson a quitclaim deed of the eleven acres. In November, 1846, he conveyed an undivided interest therein to the other plaintiffs.

" After such purchase the plaintiffs removed the buildings used by Utter for the saw-mill and clothing works, and erected in their stead a valuable building for a hoe factory, and used the same for that purpose, propelling the machinery therein with the water from the dam erected by said Utter as aforesaid, through said canal or ditch."

The said Utter and others, who occupied the eleven acres, and carried on the mills and machinery thereon, found it necessary on several occasions to repair the said dam, and for that purpose to use gravel from a pit on the lands of Henry Clarke, or those claiming under him. And before making such repairs on some of such occasions, leave to go on to said farm to get said gravel to repair the dam was asked of said owners or occupants, and granted.

On some two or three or more occasions, while William Utter was in possession, permission was asked from Henry Clarke to go upon his land to repair the dam. The right of Utter and those claiming under him to maintain said dam and ditch, and draw water through said ditch, was never called in question by any of the owners of the lands on which said dam abutted, and over which said canal or ditch was dug, until after the contract was entered into between said Johnson and Babcock for the purchase of said eleven acres.

The mortgage by Utter to William Johnson, before mentioned, was given in 1831, upon the eleven acre lot on which the mills and machinery stood and were operated. It described the premises by metes and bounds, but without the

word. " appurtenances," or other equivalent words. It was foreclosed in 1834 and 1835, and the premises were purchased by the mortgagee, who entered into the occupation thereof, and, as before stated, subsequently sold and conveyed the same to Henry H. Babcock, for himself and the other plaintiffs.

On this state of facts, the plaintiffs claim that the construction of the dam and the ditch, the mills and the machinery, under the verbal permission of the owners on both sides of the stream, never withdrawn, and the written lease of the owner on the south side, the erection of valuable buildings and the expenditure of large sums of money for the apparent purpose of a continuing and permanent business, before the eyes and in the presence of the owners of the land on both sides of the stream, and the continued operation of these improvements for manufacturing purposes for a long series of years, without objection or interruption, constitute, in equity, an irrevocable license from such owners to the continued use of the stream for the purpose named, and perpetually forbid any interference on the part of such owners with privileges thus enjoyed by their express consent and permission, and that the plaintiffs are the legitimate successors to the rights thus granted to William Utter, under the mortgage foreclosure, as incidents and appurtenances to the ownership of the eleven acres, notwithstanding the mortgage did not in terms contain any reference to the dam, canal, water-power, or the mode of the use thereof.

The position of the defendants, on the other hand, is that the right to abut the dam on the shores of the river was a right pertaining to real estate, and involved an interest in lands which could not pass or be conferred otherwise than by deed or writing; that the license was verbal and without consideration, and liable at any time to be withdrawn or revoked; that it could not ripen into a right by lapse of time, because there was no adverse possession, but one always held and enjoyed in subordination to the rights of the true owner; that whatever may have been the rights of Utter, they did not pass by the foreclosure of the mortgage to Johnson, inas-

much as the rights now in question were not mentioned or alluded to in that conveyance, or in the proceedings to consummate title thereon; and that, therefore, whatever may be the rights of the defendants, the plaintiffs are not in a condition to institute or maintain this suit for want of the requisite interest in the subject-matter involved.

They further contend that the purchase by the defendants of Henry Clarke's interest in the mode appearing by the proofs, vested in them the title of Henry Clarke to the lands on the west side of the stream to the center thereof; and the assignment by William Utter to them of the Hilliard lease vested in them the title of Hilliard during the continuance of the lease to the lands on the east side of the stream, to the center thereof.

These are the questions to be considered. In examining them, it will be convenient to inquire: First, what were the rights of William Utter in the premises in question prior to the foreclosure of the Johnson mortgage and independent of that mortgage? Second, what rights became vested by the mortgage and the foreclosure thereof in William Johnson and through him in the plaintiffs?

Let us see what has been the cause of adjudication on this subject.

The question to be determined in this case is a difficult one, and the cases are by no means uniform, and perhaps no well-defined rule can be extracted from them.

The first question to be determined is, whether the permission to build the dam and abut the same upon the lands of Henry Clarke was a mere *license*, or an interest in lands. The distinction between the two is perhaps as accurately defined in the leading case of *Mumford* v. *Whitney* (15 Wend., 380) as in any other. A license is an authority to enter upon the lands of another and do some act or series of acts thereon, without passing or intending to pass an estate therein. When they partake of the latter character they lose the character of a mere license and then become an interest in lands.

53

The former may be by parol; are valid, though not in writing; are usually founded in personal confidence, and not assignable; are generally revocable, but sometimes irrevocable; confer complete protection until revoked; are always revocable when executory, and generally irrevocable when executed. The latter are required by the statute of frauds to be in writing, and are void if not so, inasmuch as they pass or confer an estate in the land, and it is against the policy of the law, as well as against the explicit directions of the statute, that they should have force and validity unless manifested in writing. (See also *Wolfe* v. *Frost,* 4 Sandf. Ch., 72.)

I think it also sufficiently clear that permission to build a dam across a stream of water and abut the same upon the lands of another, when designed not merely for temporary but permanent use with a view to collect and divert water for milling and manufacturing purposes, is, under the decisions of our courts, of a nature which passes an interest in lands, and if it is to possess the characteristics of a *right* instead of a mere *license,* must, in order to confer *such right* and to operate as a complete protection to the licensee or grantee, be in writing. Such was the express decision in *Mumford* v. *Whitney, supra.* (See also *Thompson* v. *Gregory,* 4 Johns., 81; *Jamieson* v. *Milleman,* 3 Duer, 255; *Jackson* v. *Babcock,* 4 Johns., 418; *Miller* v. *Auburn & Syracuse R. R. Co.,* 6 Hill, 61; *Brown* v. *Woodworth,* 5 Barb., 550; *Pitkin* v. *Long Island R. R. Co.,* 2 Barb. Ch., 221.)

Notwithstanding the weight of adjudication in regard to the nature of such an interest and the necessity of a writing or a deed to give it complete efficacy, there are many cases which hold that the licensee who relies in good faith upon the license given, and acts upon it and makes permanent improvements, is not altogether remediless. Thus in *Wood* v. *Lake* (Sayer, 3), a parol agreement to stack coals on part of a close for seven years with the use of that part of the close, was held good. So in *Mumford* v. *Whitney* (15 Wend., 387), it is said that a license to enter upon land, while it remains executory, may be revoked at pleasure; but when executed, it in general can only be revoked by placing the

other party in the same situation in which he stood before he entered upon its execution.

In *Winter* v. *Brockwell* (8 East, 308), where the defendant, with the consent and approbation of the plaintiff, placed a sky-light over an open area above the plaintiff's window, by means of which light and air were prevented from entering, and the plaintiff, after it was done, gave notice to have it removed, Lord ELLENBOROUGH held, on the trial, *that the license having been acted on, and expense incurred, it could not be recalled without offering to pay all the expenses incurred under it.* The defendant had a verdict, and a new trial was denied.

In *Kern* v. *Rurick* (14 Serg. & Rawle, 267), the defendant had given the plaintiff permission to divert a stream of water and to pass the same over defendant's land for the purpose of propelling a mill which the plaintiff thereafter built on his own land. The court held the license irrevocable after the expense had been incurred; that a license may become an agreement or valuable consideration, as, when the grantee has made improvements, or invested capital in consequence of it, he has become a purchaser for a valuable consideration; and that equity would decree the specific performance of such an agreement; that a right under a license was co-extensive with the object intended, and if it was designed to be permanent in character and a perpetual exclusion of the owners rights, it was of unlimited duration.

In *Wetmore* v. *White* (2 Caines' Cases in Error) an executed parol contract for the damming and diversion of water to one side of a stream, the opposite shores of which were owned by different owners, was upheld and enforced as a contract for its perpetual diversion.

In *Pierrepont* v. *Barnard* (2 Seld., 279), it was held by this court that a parol license to cut and carry away standing timber, when fully executed before revocation, constitutes a complete protection to the licensee; and that, notwithstanding there was an agreement between the parties in a written contract for the sale of the lands, the purchaser should

not cut any timber without the consent or approbation of the vendor in writing.

It is not to be denied that, determining the case by the rules of the common law, there are a large number of apparently well-considered cases in opposition to those here referred to. They are almost all of them cited in the leading cases of *Mumford* v. *Whitney* and *Pierrepont* v. *Barnard, supra.* They are quite numerous, and many of them I think irreconcilable with the doctrine contained in most of the foregoing cases. They are so fully discussed in the two cases above cited that I deem it unnecessary to repeat them here, otherwise than by a reference to their titles. (See *Cook* v. *Stearns,* 11 Mass., 533; *Green* v. *Armstrong,* 1 Denio, 550; *Moore* v. *Wait,* 3 Wend., 104; *Fentinam* v. *Smith,* 4 East, 108; *Hewlins* v. *Shippam,* 5 Barn. & Cress., 210; *Bryan* v. *Whistler,* 8 id., 288; *Thomsom* v. *Gregory,* 4 Johns., 81; *Jackson* v. *Buel,* 9 id., 298.)

In this apparently irreconcilable conflict of authority in the courts of the common law, it is proper to consider whether a more liberal rule prevails in equity. We are determining this case in a court and in an action of the latter description, and it is fit that we should examine the cause of adjudication in tribunals of that description, and see if there be anything there to relax the unbending rigor of the common law.

In *Miller* v. *The Auburn and Syracuse Railroad Company* (6 Hill, 63), already quoted, Justice COWEN observes: " How far the cases mentioned may accord with the rule of equity which sometimes enforces parol conveyances made on valuable consideration and executed by possession, it is not necessary to inquire."

In *Pierrepont* v. *Barnard* (2 Seld., 304), Justice GRIDLEY observes: " But it will be asked, is there no remedy for a party who has proceeded under a parol license and expended his money and labor on the timber in manufacturing it into lumber? I answer, there is no remedy at law, any more than there is in a case where a man purchases a hundred acres of land by contract, and expends a thousand dollars in improvements upon it, and is sued in ejectment by the owner of the

legal estate. *In both cases he may file his bill in chancery for relief, when that court will see equal and exact justice done to both parties.* At law there is no remedy, and the defendant, before he can have any relief, must seek it at the door of another tribunal."

In *Kerr* v. *Rurick* (14 Serg. & Rawle, 267), before quoted, Justice GIBSON remarks, in a case very analogous to the present, that *equity would decree the specific performance of such an agreement.*

The leading cases in equity are collected and freely extracted from in Angell on Water-Courses, sections 318 to 325 inclusive. I will only briefly refer to a few of them. The author says the decisions of the courts of equity proceed on the principle, not that the right passes by parol license or agreement, but that wherever one party has executed it by payment of money, taking possession and making valuable improvements, the conscience of the other is bound to carry it into execution, and equity will compel him to do it. (Referring to *Le Fevre* v. *Le Fevre*, 4 Serg. & Rawle, 241; *McKillip* v. *M. I. Cheany*, 4 Watts, 317.)

So when one stood by and saw his water-course diverted, but, instead of preventing it, encouraged the work while it was going on, and afterward brought his action at law, he was restrained by injunction. (2 Eq. Cas. Abr., 523.) So in the case of long possession of a water-course by the plaintiff, the defendant having cut a channel on his own land and set up a sluice so as to divert the stream, a decree was made for the plaintiff. (*White Church* v. *Hide*, 2 Ark., 391.)

Lord Chancellor COTTENHAM, in *Williams* v. *Earl of Jersey* (1 Craig & Phil. Ch., 97), says, a party may so encourage that which he afterward complains of as a nuisance as to prevent him from complaining of it, and be prevented from doing so by any injunction, and that it was the duty of a party, seeing a nuisance in course of erection, to give notice of his intention to object.

The case of *Wetmore* v. *White* (2 Caines' Cases in Error, 87) has been before referred to. The judgment was unanimous, and the court held that a parol agreement, in part performed,

was not within the statute of frauds. In *Hulme* v. *Sheeve* (3 Green [N. J.] Ch., 16), the use of water-gates by the defendant for four years, with the assent of the complainants, was held to give the right to continue them, so long as confined to their original purpose.

The case of *Rurick* v. *Kerr* (14 Serg. & Rawle, 267), before referred to, is a signal instance of the rule which a court of equity enforces in cases similar to that under consideration. The court, among other things, says: "A right under a license, when not specially restricted, is commensurate with the thing of which the license is an accessory. Permission to use water for a mill, or anything else that was viewed by the parties as a permanent erection, will be of unlimited duration and survive the erection itself, if it should be destroyed or fall into a state of dilapidation, in which case the parties might perhaps be thought to be remitted to their former rights. But having had in view an unlimited enjoyment of the privilege, the grantee has purchased, by the expenditure of money, a right, indefinite in point of duration, which cannot be forfeited by non-user, unless for a period sufficient to raise the presumption of a release."

These views appear to me to be sound, and, if supported by the facts of this case, to have a direct and decisive bearing upon the present controversy. They seem to establish the following propositions:

First. The permission to erect a dam across the Unadilla river, and to abut the same upon the land of the riparian owner, whether it be regarded as a mere license or as conferring an interest in land, may become, under certain circumstances, irrevocable, and ripen into a right, notwithstanding such permission may be by parol. But for what seems to be the weight of authority at the common law, I should have had some doubt whether such permission was not rather a license than an easement—a privilege to employ the land for a particular purpose, rather than an interest in the land itself—revocable, perhaps, in its nature, while executory. And perhaps so, after it was executed, if obviously intended as merely gratuitous and temporary in its operation; but not irrevoca-

ble after it was executed, if originally contemplated to be perpetual, or so reasonably expected to be by the licensee, and if it was followed by substantial erections and permanent improvement, made with the knowledge of the owner of the land and without objection by him, and therefore with his acquiescence and consent.

Second. The same considerations are in substance applicable if the permission amount to an easement or interest in land instead of a mere license to do certain acts upon it. Though such an interest cannot be conferred by parol, and a defense resting upon it may possibly be unavailable at law, yet in equity, if the grant was designed to be unlimited in point of time, permanent in point of interest, to invite large outlays of money and of labor, and such were actually made in good faith, in honest reliance upon the perpetuity of the grant, and with the acquiescence and consent of the owner of the land, he is in equity estopped from violating the rights thus conferred, and it would be a fraud for him to attempt to do so.

Third. The right of the plaintiff to relief depends upon the establishment of these facts. If the license was designed to be of only temporary duration it has probably long since expired. If it was intended to be restricted to the saw-mill and clothing works originally erected and to business of that description, it cannot be enlarged so as to embrace manufactures of an entirely different and essentially permanent character, and the right of the plaintiff in any event to a perpetual injunction depends upon the structures and improvements being permanently devoted to the purposes for which the grant was originally made. When they cease to be thus appropriated, the right ceases, and the privileges revert to the grantor or his successors in the title.

The act of constructing the dam was, when done, justifiable. It was done with the permission of the owners of the land, and was, so far, an executed license. It was done for a manifest purpose, to wit: to procure a head of water and to divert such water from the bed of the stream. It was followed in the same year by the construction of a canal over

lands held by three different owners, with the obvious intent to appropriate the water-power to milling or manufacturing purposes at the terminus of the canal. It was followed, in the same or the next subsequent year, by the construction of the saw-mill and carding and cloth-dressing works, to the operation of which Utter and his successors for twenty-five years devoted the property. The owners on both sides of the stream saw these buildings in the course of construction and these expenditures being made. They must necessarily have been of considerable magnitude. The question is, what effect they had upon the rights of the owners of the land. Could the license be revoked if they saw these expenditures going on, perceived the improvements to be of a permanent character, and could reasonably have anticipated these results at the outset? I am of opinion they could not. It would be in effect giving countenance to fraud. They were bound to object in season, if they had reason to anticipate these results. They had no right to stand silently by and witness large expenditures for permanent improvements, without interposing any objection. If the permission was gratuitous it ought to have been withheld. The making of the expenditures constituted in effect a consideration. It involved the payment of money by the grantor of the plaintiffs, and resulted in harm to him, whether it was or was not a benefit to Clarke.

The effect of the acquiescence of the adjoining owners as an estoppel or as imparting irrevocability to the license, depends, it is true, in part upon the lapse of time, in part upon the amount of expenditures made, and in part upon the permanency of the improvements actually made or reasonably anticipated. No doubt the license could have been revoked, if done before it was executed. Whether it would be to that extent afterward, must depend, I think, upon circumstances. Did the adjoining owners know that a dam was to be erected in its material and mode of construction solid and permanent? Did they see the ditch in course of construction well excavated and continued over adjoining lands to an eligible location for milling or manufacturing works?

Did they observe these works in process of construction, and have reason to infer from their material, their extent, their mode of construction, their location, that they were designed to be permanent? I think we may answer all these questions in the affirmative. If not directly found by the referee, they are reasonably inferable from his report. The contrary of them certainly is not found, and we may make any reasonable intendment in support of the judgment.

These improvements were thus perfected within one year, or at most within two years, after the license was first given. The licensers had reason to anticipate from the first, from the very nature of the license sought, the permanency of the contemplated structures and improvements. If they had not, then they had abundant opportunity within that period plainly and promptly to make their protest against their further prosecution. I think they were bound to do so. It was a fraud not to do so, if they designed any subsequent revocation of the license. If they were silent when they ought to speak, they cannot now be heard when they ought to be silent. Whatever may be the rule at law, I think in such cases equity is competent, and is in the constant practice of administering proper relief.

These considerations derive additional force from the lapse of time. The licenser not only held his peace while these structures were in course of erection, but he never opened his mouth in his lifetime to object to William Utter's proceedings. Clarke died in 1831; he was the friend and connection of Utter; he devised his property to his sons; they made no objection. In the same year they conveyed to Ethan Clarke; he made no objection, at least till 1846, after the plaintiffs had contracted to purchase of Johnson, and then he only objected by granting to the defendant, Francis A. Utter, the exclusive privilege of maintaining the dam, and controlling the water to the west of the center of the stream. There was no notice to the plaintiffs, and no express prohibition to them to continue in the exercise of the privileges theretofore enjoyed. It was no consent to the destruction or injury of the dam, but a provision for its maintenance and for the use of the water by

the defendants.   It was in effect a subsequent license to the
defendants, inconsistent it may be, to some extent, with that
conferred on the plaintiffs, but still subsequent in point of
time.   Was it intended thereby to destroy the plaintiffs'
right?   Was it designed to confer on Utter the right to
destroy or mutilate the dam?

Assume that the object was to revoke the license and confer
the privileges on the defendant, Utter.   I am of opinion that
Ethan Clarke was not in a situation to do so; that the charac
ter of the license given, and the rights intended to be enjoyed
under it, the exercise of those rights in accordance with the
license given, without objection or interruption, the valuable
character of the structures erected, the magnitude of the
expenditures incurred, the permanency of the improvements
made, the acquiescence of all the parties, constitute in equity
a bar to the subversion of the plaintiffs' privileges, and the
destruction of their property.

Such was the state of things before the foreclosure of the
Johnson mortgage.   As the plaintiffs claim under that fore-
closure, it remains to be considered whether its effect was
to secure a transmission of the rights of William Utter to
Johnson, and to the plaintiffs as his grantees.

The defendants insist, as I understand them : first, that in
the mortgage, the premises are described only by metes and
bounds, without any fit words to pass the appurtenances,
and therefore that the foreclosure of that mortgage and the
purchase by the mortgagee did not pass the title to the dam
and water-privileges, first, because there are no apt words of
description under which they would be conveyed; second,
because they are not properly appurtenances to the eleven
acre lot: and, second, that by reason of the union of title, and
of possession of the eleven acre lot, and the four acre lot in
the same person, to wit, William Utter, the easement or
right of passage across the four acre lot lost its character of
an appurtenance, inasmuch as it never exists as a distinct
right or interest over a man's own property, and became
merged or united with his general ownership over the whole
property, and third, that even if the right vested in Johnson

by his purchase at the mortgage sale, it did not pass to the plaintiffs under the quitclaim deed from Johnson to them, or to Babcock, which both failed to describe the premises so as to pass this easement, and was not intended to pass it in point of fact.

1. The general rule is unquestionable, that whatever is necessary to the enjoyment of a grant, or in common use with the subject of a grant, passes with it to the purchaser as an incident or part of the same, without express words. Whether a right of way or other easement is embraced in a deed is always a question of construction of the deed, having reference to its terms and the practical incidents belonging to the grantor of the land at the time of the conveyance. (*Huttemeier* v. *Albro*, 18 N. Y., 48 ; *Tabor* v. *Bradley*, 18 id., 109 ; 21 id., 505 ; *Oakley* v. *Stanley*, 5 Wend., 523.)

The case of *Tabor* v. *Bradley* (18 N. Y., 109) is supposed by the defendants to lay down a different doctrine, but I think otherwise. That case stands on its peculiar circumstances, and if well decided (which I will not discuss, and do not deem it necessary to dispute), should not be intrusted as authority beyond the range of the facts therein mentioned. It was held in that case, that the premises conveyed by metes and bounds did not pass a mill-dam and water-privilege alleged to exist thereon, but it is distinguished in three particulars (one of which is mentioned by Judge Pratt, and two by Judge Denio) from most cases of this description. First, it contained no evidence that the grantors knew or supposed there existed any such rights or privileges on the premises. Second, the mill-dam and water-privilege according to the fair inference from the evidence, were not *in existence* on the premises at the time of the conveyance, or at least it is doubtful whether they were. Third, the presumption of knowlege in the grantor of the nature, incidents and privileges of this description existing on the premises, arising in ordinary cases, was held not to apply in the particular case which was the grant of wild lands by a company which was the owner of immense tracts of that description.

This does not interfere, I think, with the general doctrine that the grant of land ordinarily conveys not only the land itself but all that is upon it or attached to it, and all which has been connected or enjoyed with it as an incident or appurtenance to its ordinary use. Hence the conveyance of lands would pass a mill and mill-pond and canal upon the same; and the latter would pass the flowage of water and water-privileges enjoyed and used with it and often giving to it its chief value. (4 Kent's Com., 467; *Oakley* v. *Stanley*, 5 Wend., 523; *Burr* v. *Mills*, 21 id., 290; *Le Roy* v. *Platt*, 4 Paige, 77.)

2. I do not think that the fact that William Utter owned simultaneously the four acre and the eleven acre lots which adjoined each other extinguished the easement or right of water passage analogous to a right of way across these lands, so that when the ownership of the two lots became separated and one, that of the four acre lot remained in Utter, and the other, that of the eleven acre lot, passed on the foreclosure of the mortgage to Johnson, that Johnson necessarily lost the right of way or of water passage across the four acre lot.

I admit the general rule that a man cannot ordinarily have an easement or right of way over his own lands (*Hutte-meier* v. *Albro*, 18 N. Y., 111; Angell on Water-courses, Sec. 191 to 195), because, having the whole estate in the lands, such right of way as a special and independent right is unnecessary to be maintained, he having a perfect right of way over every part of his own premises. But each case must be judged by its own peculiar circumstances; and if it be quite obvious that the right of way for carriage by land or passage of water was intended to be preserved as a distinct and independent interest, if such be obviously necessary and indispensable for the full enjoyment of the lands conveyed in the most lucrative manner, if such easement has been practically preserved and enjoyed for a long series of years in the same person notwithstanding the unity of title and of possession, then we are, I think, entitled to regard and treat it as an appurtenance or mode of enjoyment which is

designed to be perpetual as long as the necessity for it continues.

Moreover, if we conclude that the conveyance of the eleven acre lot to Johnson passed to him the mill and the factory thereon, and the ditch or canal feeding the same, so far as they were actually located on the eleven acre lot, by the mere force of the ordinary words of conveyance therein, then I think, under the cases already cited, the right to flow water in the canal across the four acre lot passed to Johnson as a natural incident or appurtenance to the useful and long continued enjoyment of the premises embraced in the eleven acre lot. They were strictly rightful and essential incidents to the accustomed use of that property, and are to be maintained, not as conveying any land outside of the boundaries in the deed, but collateral rights and privileges over the land of another, necessary to the profitable enjoyment of the first, confirmed and matured by long usage, and therefore properly concluded to have been within the intention of the parties to pass by a conveyance thereof.

3. The same course of reasoning which has been heretofore employed to justify the conclusion, in a certain aspect of the facts of the case, that Johnson succeeded to all the rights of William Utter, will also, in the same aspect of the facts, justify the conclusion that Henry H. Babcock and the plaintiffs succeeded to the rights of Johnson.

The grounds upon which the defendants' counsel argue otherwise, rest mainly on incidents founded on the facts of the case, as that Babcock purchased by quitclaim deed; that he paid not more than half the value of the premises for milling and manufacturing purposes; that Johnson declined to give any guaranty of the water-rights and privileges; that Babcock had reason to believe the right would be denied and controverted by the Utters, and, therefore, was a bold speculator or prowling assignee.

All these are questions of fact properly addressed to the referee and the court below, but not to us, except in a limited point of view, as having some bearing on the construction to be given to the instruments. The referee has decided against

them, and must be assumed to have found the intentions of the parties to have corresponded with the theory which the plaintiffs put forth, and we must address ourselves to the task of giving a construction to these instruments, assuming these inferences of the referee to be correct.

The case then appears to occupy this position:

The mortgage described the premises by metes and bounds but made no allusion to mills, canal or water-power, on its face. There can be no doubt that it would carry with it the mills and such part of the canal as were within its boundaries, together with the water-power and privileges which properly pertain to the mills and that part of the canal. This would embrace the flow of so much water as was accustomed to flow and to be used on the premises conveyed.

It follows that the source of supply could not be lawfully interfered with, for that would interrupt and curtail the usual quantity. Hence, as the water was not and could not be derived from any other source, the mortgagee and purchaser was entitled, as a part of his purchase, to be protected in the rights and privileges theretofore enjoyed, and, among them, in the full enjoyment of the means essential to procure the supply of water needed for the operation of the mills. This right was, I think, as absolute as if the water which flows through this artificial canal had come between the banks of a natural stream. In the latter case it will not be pretended that the riparian proprietor above could divert the water, or interfere with its accustomed flow to the mills below. This course of reasoning tends to show that there was no right to divert the water. Perhaps it is unnecessary to inquire whether this also passed the right to the property in the dam or the right of reparation thereof, although I think it did as an appurtenant or incident to the principal thing conveyed, and as one means, and the chief means, for procuring the quantity of water which could not otherwise be supplied.

If I am correct in these propositions, then the effect of the foreclosure was to transmit to Johnson, and through him to the plaintiffs, not only the land embraced within the boundaries of the deed and all the structures and improvements

upon it, but all the rights and privileges incident and appurtenant to it.   If so, then none of them remained in William Utter, and none of them passed by the attempted assignment of the Hilliard lease by William Utter, to his sons Francis A. Utter and Jacob S. Utter, in March, 1839.

Hence, the plaintiffs have a perfect title, and the defendant's acts were without authority of law and a direct invasion of the plaintiffs' rights.

I think the judgment should be affirmed with costs.

Judgment reversed.