WILLIAM M. KINGSLAND, SURVIVOR, ETC., RESPONDENT, v. THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK AND OTHERS, COMPOSING THE DOCK DEPARTMENT OF THE CITY, APPELLANTS.

*Defective descriptions in conveyances — the actual occupation by the parties is to be considered in construing them — liability of the City of New York for discontinuing a bulk-head by the establishment of a new one — it is not liable in damages for an injury to one holding under a license granted by it, terminable at its pleasure.*

In attempting to ascertain the boundaries of property, the description of which is defective, the acts of the parties in the practical construction given to such description by occupancy on the one part, and consent or acquiescence on the other, are legal evidence of their intention and have weight and effect upon the construction to be given to the conveyances executed on the one part and received on the other.

Upon the trial of this action, brought by the plaintiff to recover damages occasioned by the discontinuance of a bulk-head owned by his testator which extended along the westerly line of West street, which was formerly the westerly water line of the city of New York, evidence was given showing that the plaintiff's testator owned the bulk-head, and that the defendant, in 1880,

entered upon the property westerly of West street, and filled in from the west line of West street with solid filling for a distance of about 180 feet farther into the river, placing the bulk-head line at the extremity of this distance instead of on the west line of West street, thereby destroying the plaintiff's bulk-head for use as a wharf, for which purpose it had been erected.

*Held,* that the city was liable in damages, for the discontinuance of the bulk-head, to the person entitled to its emoluments in the way of wharfage.

*Langdon* v. *Mayor* (28 Hun, 158; affirmed, 93 N. Y., 129) followed.

That, as the intention as well as the result of what was done was the complete and permanent extinguishment of the use of the westerly side of West street as a wharf, the damages to be recovered should be the same in amount as the compensation which would have been made in proceedings to acquire the rights of the testator thereto, had they been instituted, which proceedings were provided for in the act which authorized the city to do the work.

That, in determining the amount of such compensation, no allowance should be made for the injury occasioned by the loss of the privilege of erecting platforms or sheds beyond the westerly line of West street, which privilege had been granted to the testator or his lessees by the defendant through its boards and officers, nor for the destruction of the platforms and sheds so erected, as it appeared that the said privileges and licenses were, when granted made terminable in the discretion of the board or body so granting them.

APPEAL by the defendants from a judgment entered upon the report of a referee.

*F. A. Irish,* for the appellants.

*Stewart & Boardman,* for the respondent.

DANIELS, J :

The object of the action is the recovery of damages for discontinuing a bulk-head on the preceding westerly water line of the city of New York. It has been brought by the plaintiff as the surviving executor and trustee under the will of Daniel C. Kingsland, deceased, and the bulk-head in controversy adjoined Charlton street on the north and extended southerly 104 feet or thereabouts, on the westerly line of West street. The rights of the plaintiff as they have been presented in the action have been derived under two deeds, one of which was made by the mayor, etc., of the city of New York to John R. Ritter, on the 21st of November, 1804, and the other by the same grantors to Cornelius Harsen on the 31st of July in the year 1815. The objection has been made at the outset of the case, that as these deeds are declared to convey no more than

" to pass the estate, right, title or interest which they (the mayor, etc.), have or may lawfully claim by virtue of their several charters, the grantees respectively in them do not appear to have acquired any title or right to use or enjoy the bulk-heads erected on the westerly bounds of West street." But this objection is conclusively answered by the facts, that in the year 1686, by the Dongan charter from the crown of Great Britain to the mayor, etc., all the waste, vacant and unoccupied land between high and low-water mark around the Island of Manhattan was conveyed to and vested in the city. This was followed by the Montgomerie charter in 1730, through which in like manner there was vested in the mayor, etc., " land under water for 400 feet beyond low-water mark, and extending on the west side of the city from near the Battery to Bestavers Killete " a rivulet or small creek which entered the Hudson above Charlton street. What the distance was at the point in controversy between high and low-water mark has not been made to appear definitely in the case, but it is evident from the facts that it included a substantial space of ground. And in the deed executed and delivered by the mayor, etc., to Ritter, the easterly boundary of the land conveyed was declared to be the west side of Greenwich street between high-water mark and a certain new street of seventy feet in breadth, etc. How far the westerly side of Greenwich street extended beyond the high-water mark has not been very clearly made to appear in the case, but it may be assumed to have been in some substantial degree beyond the high water line of the Hudson river. And that would bring the westerly line of West street within the westerly boundary of the 400 feet of land conveyed to the city through the Montgomerie charter. For by the deed the low-water mark appears to have been at a point between Greenwich and Washington streets, and the land conveyed by the deed extended westerly from that point eighty feet to Washington street. That street was intended to be, as it was afterwards made, of the width of sixty feet; the block between that and the easterly side of West street was made 190 feet, and West street of the width of seventy feet, which together would aggregate no more than 400 feet of ground. And if the block between Greenwich and Washington streets was designed to be of the same width as the block between Washington and West streets,

then the low-water mark would be from the westerly bounds of Greenwich street the distance of 110 feet into the river. It probably from the map was not designed to be one of the same width as the westerly block, but even if they were in this respect precisely alike, it would appear that the city was the owner of the land described in the deed at the time when it was made and executed. And beyond that is the presumption, in the absence of any proof inconsistent with it, that the city owned all the property and rights professed to be conveyed by the deed.

The title of the city to the property conveyed to Harsen is equally as evident, for its easterly boundary was made the center of a certain new street " hereinafter mentioned, to be made there, called Washington street," and from that line of land extended westerly to the west line of the street to be called West street. That the city was at the time when these deeds were made the owner of land under water beyond the westerly line of West street is also clearly evident from the fact that easterly of the 400 feet conveyed to Ritter, it was the owner of the land from the east side of Greenwich street to the high-water mark of the river, and it accordingly conveyed no more by either of these deeds than it was at the time entitled to convey to the grantees therein.

These deeds together conveyed 104 feet on the river front, and by a partition deed made between John P. Ritter, the son of the grantee in the first of these deeds, and Joanna H. Harsen, his daughter, and Cornelius Harsen, the grantee in the second deed, the rights and interests acquired in the bulk-head by Harsen, and a portion of those acquired by Ritter, appear to have been set off to Joanna Harsen. It has been objected by the defendants that the partition should not be accorded that effect over the property in controversy, for the reason that the land partitioned was described in it as bounded on the west by West street. It is, however, to be gleaned from so much of the deed as the case contains, that the parties intended, in making this partition, to include the rights and interests which had been acquired to the use and enjoyment of the westerly side of West street. For, in addition to the property partitioned and mentioned in the deed and exhibited upon the map, the deed conveyed " all and singular the rights, privileges and advantages thereunto belonging or in anywise appertaining," and

the right to erect a bulk-head on the westerly side of West street and enjoy its emoluments and advantages, was one of the rights and privileges appertaining to the property partitioned. This partition was followed by a conveyance executed by Cornelius Harsen and Joanna H. Harsen, his wife, to Jonas Mapes, conveying the same and other property to the grantee. And he and his wife afterwards, in like manner, conveyed to Cornelius Harsen, who seems to have succeeded in this way to the rights of the grantees in all or most of the property in controversy, and they claimed and controlled it to the period of his decease. By his will he devised his real estate to his executors empowering them to make a sale of it, and his two surviving executors conveyed the property to the testator and Cornelius K. Sutton. It has been objected on behalf of the defendants that this effect cannot be given to that conveyance for the reason that the northerly and southerly lines of the land described in it are projected westward from the westerly line of West street and include no land either above or below the water. But while that is the direction given to these lines there is still enough remaining in the deed to include the conveyance or transfer of the rights and privileges now in controversy. For the deed not only by express words conveys the westerly or bulk-head front of West street, but in addition to that, it mentions the property as having belonged to the estate of Cornelius Harsen, deceased, which was not the fact as to any property west of West street. The further statement is also contained in the deed that the land under water intended to be conveyed extended of the width described into the Hudson or North river as far as the said Cornelius Harsen at the time of his death had or could have any right, title or interest, and as far as the parties of the first part have or can have any power or rights to grant and convey the same. And also all and all manner of cranage, wharfage, profits, benefits, and advantages and emoluments growing, arising, or accruing by or from the wharf or wharfs now, or hereafter to be made on said premises as conveyed by the mayor, aldermen and commonalty of the city of New York and the original grantors thereof." These clauses, considered with the additional assistance of the attendant facts, justify the construction that the lines were inadvertently stated to extend westerly, when, as a matter of fact thay were intended to proceed easterly and to include,

not only the bulk-head line as the deed clearly did, but the residue of the testator's property eastwardly therefrom; and these grantees, on the 10th of January, 1872, joined in a lease of it to the Liverpool, New York and Philadelphia Steamship Company, acting by John G. Dale as its agent. This lease was made for the term of ten years, and provided for its renewal at the option of the lessee for a still additional period of ten years. Sutton, who owned one-third of the property, sold and conveyed it to the testator, entitling the plaintiff as his surviving trustee to maintain this action for the recovery of the damages accruing from the discontinuance of the bulk-head on the westerly line of West street, by the act of the defendants. This title has been acquiesced in by the city during the entire period through which it has passed, and in 1818 it directed the proprietors of the ground to proceed with the construction of the street and bulk-head upon it, and have that completed by the 1st of July, 1819, which was afterwards extended to the first of December of the same year; and in 1851 the common council, by resolution, gave permission to Kingsland & Sutton to pile and bridge out for a distance of thirty feet beyond the bulk-head in front of their property in West street, near Charlton street. This resolution contained an express admission of the fact of their title; and their own possession and use of the property is further evidence of their rights, for the acts of the parties under defective conveyances in the practical construction given them by occupancy on the one part and consent or acquiescence on the other, are legal evidence of their intention, having weight and effect upon the construction to be given to the conveyances executed on the one part and received on the other. (*Reed* v. *Proprietors, etc.*, 8 How. [U. S.] 274, 290, 291.) The objections taken to the title of the plaintiff to this controverted bulk-head are not well founded, and were correctly overruled, so far as they appeared in the case, in the decision made by the referee.

In 1880, and while the lease already mentioned was in force, the dock department of the city entered upon this property westerly of West street, and filled in from the line of West street with solid filling for a distance of about 180 feet farther into the river, placing the bulk-head line at the extremity of this distance instead of on the west line of West street. That destroyed the bulk-head on the

line of the street for all the purposes for which it was designed, under the original conveyances, to be created. The object of its erection on the west line of West street was the creation of a wharf to be used in the commercial business of the city, and, so far at least, for the benefit and advantage of the persons creating it, under these conveyances, as to entitle them "at all times forever thereafter to fully have, use, enjoy, take and hold to his or their own proper use, all manner of wharfage, cranage, advantages and emoluments growing or accruing by or from the said wharf or street," etc. These rights and privileges were completely extinguished on the line of West street by this extension of the water front. It was made under the authority of chapter 383 of the Laws of 1870, as that was amended by chapter 574 of the Laws of 1871, so much of which has since been continued in force by section 119 of chapter 335 of the Laws of 1873, and section 712 of chapter 410 of the Laws of 1882, as related to the improvement of the water front of the city of New York. It was supposed by the department that it had been authorized in this manner, subject to the approval of the commissioners of the sinking fund, to locate the line of and improve the wharves, piers and bulk-heads of the city of New York, without providing compensation to the persons who had acquired these rights under the city. The construction acted upon was, that the deeds proceeding from the city were subject to its future authority in locating, regulating and extending the water line of the city; but as they contained no qualification whatever entitled to that effect, it has been held that the city became liable for the discontinuance of the bulk-head in damages to the persons entitled to its emoluments in the way of wharfage. (*Langdon* v. *Mayor, etc.*, 28 Hun, 158; affirmed, 93 N. Y., 129.)

These decisions completely settle the title of the plaintiff to recover such damages in this action as were sustained by the extinguishment of these rights and privileges. And the important point still to be considered in the case is the extent to which such damages may be legally allowed. The intention, as well as the result of what was done, was the complete extinguishment of the use of the westerly side of West street as a wharf. It was permanently and finally terminated by the act of the defendants, and what they have become liable to pay is the value of the rights and privileges

which were in this manner divested. The acts of 1870 and 1871 contemplated the performance of all that has taken place. And to facilitate and carry it into effect it was provided by subdivision ten of section six of the act of 1871 that the commissioners of the land office should be authorized to convey all the property, right, title and interest of the State to the land under water, requisite for the making of the improvement. And such a conveyance was, in fact, made on the application of the city authorities. It was also assumed in the act that it might become necessary to acquire private rights of a proprietary character in the course of the improvement. And provision was made by subdivision four of the same section for their acquisition through the proceedings authorized for taking private property for public streets or places in the city of New York. These were not resorted to for the discontinuance of this bulk-head as a wharf, for the reason already mentioned that it was supposed that they were subordinate to the rights of the city to project and make these improvements. But what the city failed to do under this authority of the law was designed to be substantially accomplished through the intervention and result of this action. And for that reason the compensation to be made in the suit should be the same as would have been made in such proceedings if they had been instituted under the authority of the law. (*Taylor* v. *Metropolitan, etc., R. R. Co.,* 50 N. Y. Supr. Ct., 311; *Ireland* v. *Same,* 52 id., 450; *Story* v. *N. Y. Elevated R. R. Co.,* 90 N. Y., 122.) And that compensation is the value of the rights and interests in this manner appropriated and affected injuriously by the authorities of the city together with interest upon the amount from the time of such appropriation. This subject was considered very fully in *Matter of New York, Lackawana and Western Railroad Company* (33 Hun, 639), where the rule as it has been acted upon was repeated and many of the authorities illustrating it were cited and approved. And it was sanctioned in *Henderson* v. *N. Y. Central, etc., R. R. Co.* (78 N. Y., 423). Under that rule the practice has been followed of giving to the owner the full value of the property intended to be taken, and a fair equivalent for the diminution of the residue left to the owner, as that may be caused by taking a portion of the property owned by him. As, however, this bulk-head was entirely disconnected from the

other real estate of the plaintiff in the vicinity and wholly separated from it by the width of West street, it may well be that no more can be allowed in the way of compensation than the value of the bulk-head itself and the rights and privileges connected with its use and enjoyment as a wharf. (*Matter of N. Y., L & W. R. R. Co.* v. *Arnot*, 27 Hun, 151.)

A further and important element, however, entered into the allowance of compensation made by the referee in this action. That was placed upon the fact that permission was obtained by John G. Dale as the agent of the lessee, to extend the structure westerly of the platform made under the resolution of the common council of 1851, a further distance of about sixty or sixty-five feet into the Hudson River, beyond the westerly line of the preceding platform, and to erect a shed over it for the convenience of the business of the lessee. This privilege was expected to be secured before the lease of the bulk-head was taken, and the amount of the rent reserved by the lease was greatly increased by that circumstance. The privilege of extending the bulk-head in this manner and placing a shed over a large portion of it, capable of being thoroughly inclosed, adds very greatly to the value and emoluments of the property. And this valuation, as the platforms and shed were discontinued by the extension of the improvement into the river, was necessarily terminated and ended. But it by no means follows from these facts that the referee was warranted in making any allowances whatever for so much of the value, profit or emoluments, as might arise out of these extensions beyond the bulk-head line of West street. As to the first, which was provided for by the resolution of 1851, it was merely permitted by the common council. No fixed period of time during which the platform might be maintained in this manner was declared in or by the resolution, but it was in its nature wholly permissive, and as a matter of law it was made without right. (*People* v. *Mallory*, 46 How, 281; *Commissioners of Pilots* v. *Clark*, 33 N. Y., 251.) By neither chapter 222 of the Laws of 1830, nor by section 1, chapter 261 of the Laws of 1858, was any authority created for permitting structures of this description to be placed beyond the bulk-head line. The first of these acts provided only for the designation or appropriation of public wharfs for the exclusive use of steamboats, or other classes or description

of vessels, while the latter act created the same authority for the designation of wharfs for the exclusive use and occupancy of the steamboats of the lessees thereof, so far as that might be necessary for the conducting and managing of their business. They, in no manner, provided for placing structures in the water of the river beyond the bulk-head line. And such structures were forbidden by section 10, chapter 129 of the Laws of 1801, the object of which, in part, was to provide for the construction, regulation and use of wharfs on the water-line of the city.

At the time when permission was given to extend this structure farther into the river, no more authority than this was vested over this subject either in the common council or the commissioners of the dock department. And by their action they did not attempt to vest any fixed or permanent rights in the tenants to whom permission was given to extend the platform sixty feet farther into the river and to erect a shed upon it. What was done and all that was done by the resolution adopted for this purpose, which was in these words :

"*Resolved*, That permission be granted to Mr. John G. Dale, agent of the Liverpool, New York and Philadelphia Steamship Company to build a platform on piles in front of the bulk-head between piers 44 and 45, North river, leased by said company from private parties, extending outward from the present line of bulk-head a distance of about sixty-five feet. Also to erect over said platform a shed one story high for the protection of freight, the eastern extremity of said shed not to extend beyond the line of the shed erected by the New York and Troy Steamboat Company on pier 44 adjoining, and in conformity with the plans to be submitted to and approved by this board, and provided that in the erection of said shed, all requirements of the fire laws of the city are complied with, and provided also that the consent in writing of the owners of said bulk-head and of the owners and lessees of the north side of pier 44, North river, to such extension be first obtained and filed in this department. The work to be done under the supervision of Superintendent Westervelt, and to remain during the pleasure of the board.

"Respectfully yours,

(Signed)     "J. GRENVILLE KANE,

"*Commissioner and Secretary pro tem.*"

was to permit the extension to be made and to be maintained only " during the pleasure of the board." And that this was not intended to be by any means durable seems to follow from the fact that the board had previously been vested with the authority to extend the bulk-head line into the river by making the improvements provided for by the act of 1870, as that was amended by the act of 1871. The permission contained in the resolution was given after the completion of this legislative authority, and must necessarily, aside from its language, have been intended to be subordinate to such authority, and to have entitled the department to terminate it whenever that should become necessary for the purpose of going on with the improvement. Even this authority, or license, the department seems to have had no power to give prior to the enactment of chapter 249 of the Laws of 1875. And as that provided for no more than the privilege of erecting and maintaining sheds upon the pier or bulk-head, it is difficult to derive from it the power to concede the privilege of putting such structure beyond the bulk-head, or outside the piers, in the water, inasmuch as that would not be placing them upon the pier or bulk-head within the language employed in the statute, but adding them as outside structures to the pier or bulk-head. But even if this statute should be otherwise construed, it provided for nothing beyond a license, or authority, to erect or maintain the sheds. It did not provide for vesting in the person to whom the privilege should be given, any right to maintain the platform or shed for any particular period of time. But what was provided for was a license, or authority, which it was declared should be " subject to the conditions and restrictions contained in such license or authority." And it was farther added by section 4 of the same act, that nothing contained in it should impair any powers conferred upon the department of docks in the city of New York by existing laws, except as provided in section third of the act and that section has no relation to this controversy. It is manifest, therefore, that no property right was designed to be, or was in fact, conferred or created by this resolution. It was a privilege granted subject to the existing laws providing for this improvement of the water front of the city, and made dependent by the resolution itself upon the pleasure of the board adopting it. And the right so to terminate it was exercised

when this improvement was made in the year 1880. And in ending it in that manner no more was done than had the sanction of the law as well as the condition on which the resolution was dependent. (*Babcock* v *Utter*, 1 Keyes, 397; *Wood* v. *Leadbitter*, 13 Mees. & Wels., 838.)

That the privilege of using corporate property granted in this manner may be terminated without making compensation for it by the party creating the privilege and reserving the right to terminate it, clearly follows from its dependence upon this mere volition, and in other cases of similar concessions and like reservations in favor of the public this principle has been held and adhered to by the courts. (*Hatch* v. *Cincinnati, etc., R. R. Co.*, 18 Ohio, 92; *Hubbard* v. *Toledo*, 21 id., 379, 398; *Fishbach* v. *Woodruff*, 51 Ind., 102.; *Little Miami Elevator Co.* v *Cincinnati*, 30 Ohio, 629; *Commonwealth* v. *Penn. R. R. Co.*, 51 Penn., 351, 354; *Fox* v. *Cincinnati*, 104 U. S., 783; *Patten* v. *N. Y. Elevated R. R. Co.*, 3 Abb. N. C., 306; *Matter of Com'rs State Reservation at Niagara, etc*, 37 Hun, 537; *Ex Parte Miller*, 2 Hill, 418; *Mattoon* v *Monroe*, 21 Hun, 74 *Burbank* v. *Fay*, 5 Lans., 397; *Dermott* v. *State*, 99 N. Y., 101 )

The case of *Smith* v. *City of Rochester* (92 N Y., 463) is in no manner inconsistent with the principle which has been mentioned, for there the plaintiffs were held to have had a right to the water of which they were deprived by the act of the city, as distinguished from a mere conditional privilege of the nature of that upon which these structures were entitled to be placed. The tenure provided for them was not property held against the authority of the city. It was no more than a concession or privilege which it had reserved to itself the right to withdraw at its own pleasure. When it was withdrawn it was not done wantonly or capriciously, but because it had become a necessity for the making of the improvement authorized by law, and provided for by the action of the board of dock commissioners. This license or privilege, although similar licenses were from time to time granted to others and increased the value and enjoyment of the property to which they were incidental, should not have been included as an element for which compensation should be made by the defendant in this action. It did form a very material if not the greater part of the support for the

amount which the referee found the plaintiff to be entitled to recover.

And to correct this error the judgment in the case should be reversed and a new trial ordered, with costs to abide the event.

BRADY and BARTLETT, JJ., concurred.

Judgment reversed, new trial ordered, costs to abide event.